## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| W.J. BRADLEY MORTGAGE CAPITAL, LLC, *et.al.*,<br>　　　　　*Debtors.* | Case No. 16-11049 (KG)<br><br>Jointly Administered |
| GEORGE L. MILLER, Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of W.J. Bradley Company Merchant Partners 2003-SEED, LLC, W.J. Bradley Mortgage Capital, LLC, W.J. Bradley Corporate Services, LLC, W.J. Bradley Financial Services, LLC, and WJB Mortgage Services, LLC,<br><br>　　　　　*Plaintiff,*<br>　　　　　　　　　　　v. | Adv. Pro. No. 18-50385 (KG)<br><br><br>Re: Adv. Dkt. Nos. 20, 22, 23, 24, 25, 26, 27 |
| WILLIAM J. BRADLEY, JOSEPH A. CAMBI, ARTHUR S. DEMOULAS, GERARD LEVINS, AUDREY KIRDAR, DANIEL BARUCH, HOWARD MICHALSKI, ASD MERCHANT PARTNERS LLC, SPRINGFIELD CAPITAL, LLC, ARTHUR S. DEMOULAS CONTINUATION TRUST, ARTHUR S. DEMOULAS 2012 TRUST, and PETER PICKNELLY,<br><br>　　　　　*Defendants.* | |

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren, Esq.
Benjamin M. Mather, Esq.
Francis X. Lane, Esq.
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel: (215) 735-8700

GELLERT SCALI BUSENKELL & BROWN LLC
Ronald S. Gellert, Esq. (DE No. 4259)
1201 N. Orange Street, 3rd Floor
Wilmington, DE 19801
Tel: (302) 425-5806

Dated:  September 7, 2018　　　　　　　　　　　　　　*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................ii

TABLE OF AUTHORITIES ........................................................................................ iv

I.   NATURE AND STAGE OF THE PROCEEDING ...........................................1

II.   INTRODUCTION ...............................................................................................2

III.   STATEMENT OF FACTS ..................................................................................5

    A.  The Redemption Transaction ....................................................................6

    B.  WJB Went Into a Death Spiral Immediately Following the Redemption
        Transaction.................................................................................................9

    C.  Other Fraudulent and/or Preferential Transfers .......................................10

        1.  Excessive Board Fees to Cambi.....................................................10

        2.  Coupon Payments to Springfield Capital ......................................10

        3.  Loan Payments to Springfield.........................................................10

        4.  Payments of Dividends to Members ...............................................11

    D.  The Complaint ..........................................................................................11

IV.   LEGAL STANDARD.........................................................................................12

V.   ARGUMENT .....................................................................................................13

    A.  The Complaint Sufficiently Alleges Breaches of Fiduciary Duty Against Each
        Moving Defendant ....................................................................................13

        1.  The Moving Defendants Each Owed Fiduciary Duties to the Debtors .................14

        2.  Moving Defendants' Purported Exculpation Affirmative Defense Cannot Be
            Resolved at the Pleading Stage.............................................................15

        3.  The Complaint Sufficiently Alleges Breaches of Fiduciary Duty by Each
            Defendant and Defendants are Not Protected by the Business Judgment Rule.....17

    B.  The Complaint Adequately Pleads Claims to Recover the Fraudulent Transfers .......26

1.   Counts 2 and 5 State Claims for Avoidance of the Cambi Excessive Board Fees, the Springfield Coupon Payments and the Springfield and Bradley Dividends as Actually Fraudulent ...................................................................................................27

2.   Counts 3 and 5 State Claims for Avoidance of the Cambi Excessive Board Fees, the Springfield Coupon Payments and the Springfield and Bradley Dividends as Constructively Fraudulent....................................................................................31

3.   Count 4 States a Claim for Avoidance of the Springfield Loan Payments as Preferential Transfers............................................................................................37

4.   The Complaint Sufficiently Alleges Claims Against Cambi for the Fraudulent and Preferential Transfers to Springfield......................................................................38

5.   Because the Complaint Adequately States Avoidance Claims, Plaintiff's Claim for Recovery of the Avoided Transfers Under § 550 Also States a Claim for Relief.....................................................................................................................39

C.   The Complaint States a Claim for Aiding and Abetting Breaches of Fiduciary Duty..............................................................................................................................40

D.   The Complaint Adequately Pleads a Claim for Unjust Enrichment ............................41

E.   The Complaint Adequately States a Claim for Corporate Waste ...............................42

VI.   CONCLUSION...............................................................................................................44

# TABLE OF AUTHORITIES

## CASES

*Alidina v. Internet.com Corp.*, 2002 WL 31584292 (Del. Ch. Nov. 6, 2002) ..............................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................13

*Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451
(Del. Ch. Apr. 20, 2009) ..............................................................................................13, 14

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................13, 33

*Buckley v. O'Hanlon*, 2007 WL 956947 (D. Del. Mar. 28, 2007)...............................17, 24

*Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*,
229 F.3d 245 (3d Cir. 2000)................................................................................................27

*Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096 (Del. Ch. 2008) ......................40

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ........................................13, 18

*Cumming v. Edens*, 2018 WL 992877 (Del. Ch. Feb. 20, 2018) ..................................22, 23

*Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215 (D.N.J. June 20, 2011)....................15

*Feeley v. NHAOCG, LLC*, 62 A.3d 649 (Del. Ch. 2012).....................................................16

*Guttman v. Huang*, 823 A. 2d 492, 506 n.34 (Del. Ch. 2003))........................................19

*Halpert v. Zhang*, 966 F. Supp. 2d 406 (D. Del. 2013) ..................................................23

*Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261 (3d Cir. 2016). ...........................15

*Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. and Supplies, Inc.*,
2016 WL 8256412 (E.D. Pa. Sept. 16, 2016) ....................................................................35

*In re Adelphia Commc'ns. Corp.*, 365 B.R. 24, (Bankr. S.D.N.Y. 2007) ......................30

*In re AgFeed USA, LLC*, 546 B.R. 318 (Bankr. D. Del. 2016)........................................29

*In re AgFeed USA, LLC*, 558 B.R. 116 (Bankr. D. Del. 2016)........................................21

*In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747 (Bankr. D. Del. 2007).........................32

*In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 80 (Bankr. D. Del. 2008)..........................29

*In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289 (D. Del. 2012)..........................39

*In re Autobacs Strauss, Inc.*, 473 B.R. 525 (Bankr. D. Del. 2012).............................36

*In re B. Moss Clothing Co., Ltd.*, 2011 WL 3878387 (Bankr. D.N.J. Aug. 31, 2011) ................36

*In re BMT-NW Acquisition, LLC*, 582 B.R. 846 (Bankr. D. Del. 2018)....................34, 36

*In re Bridgeport Holdings, Inc.*, 388 B.R. 548 (Bankr. D. Del. 2008) ......................16, 23

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) ........................24

*In re Centaur, LLC*, 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ....................34

*In re Charys Holding Co.*, 443 B.R. 628 (Bankr. D. Del. 2010) ....................................28, 32

*In re ContinuityX, Inc.*, 582 B.R. 124 (Bankr. S.D.N.Y. 2018)......................................39

*In re Covenant Partners, L.P.*, 531 B.R. 84 (Bankr. E.D. Pa. 2015)............................34

*In re DBSI, Inc.*, 2011 WL 1810632 (Bankr. D. Del. May 5, 2011) .............................29

*In re DBSI, Inc.*, 445 B.R. 344 (Bankr. D. Del. 2011)....................................................34

*In re Direct Response Media, Inc.*, 466 B.R. 626 (Bankr. D. Del. 2012)....................17, 43

*In re DSI Renal Holdings, LLC*, 574 B.R. 446 (Bankr. D. Del. 2017) .........................17, 41

*In re DVI, Inc.*, 326 B.R. 301 (Bankr. D. Del. 2005)......................................................34

*In re FAH Liquidating Corp.*, 572 B.R. 117 (Bankr. D. Del. 2017)..................33, 34, 41, 42

*In re Fedders N. Am., Inc.*, 405 B.R. 527 (Bankr. D. Del. 2009) .................................29, 40

*In re Fruehauf Trailer Corp.*, 444 F.3d 203 (3d Cir. 2006) .........................................32

*In re Glencoe Acquisition, Inc.*, 2015 WL 3777972 (Bankr. D. Del. June 16, 2015)...................34

*In re Green Field Energy Servs. Inc.*, 2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015).........33, 42

*In re Hill*, 342 B.R. 183 (Bankr. D.N.J. 2006)...............................................................29

*In re Jevic Holding Corp.*, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ...........36

*In re Liquid Holdings Group, Inc.*, 2018 WL 2759301 (Bankr. D. Del. June 6, 2018)...............15, 16, 29

*In re Nat'l Serv. Indus.*, 2015 WL 3827003 (Bankr. D. Del. June 19, 2015) ...............28

*In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1 (Del. Ch. 2014) .................13, 17

*In re PennySaver USA Publ'g, LLC*, 587 B.R. 445 (Bankr. D. Del. 2018) ..................34

*In re Pitt Penn Holding Co.*, 484 B.R. 25 (Bankr. D. Del. 2012)..................................21, 32

*In re Plassein Int'l Corp.*, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008).............32

*In re Polichuk*, 506 B.R. 405 (Bankr. E.D. Pa. 2014)....................................................29, 30

*In re Primedia Inc. Derivative Litig.*, 910 A.2d 248 (Del. Ch. 2006) .........................23

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)...............................................................32

*In re Ritz Camera & Image, LLC*, 2014 WL 432192 (Bankr. D. Del. Feb. 4, 2014) ...................40

*In re Simplexity, LLC,* 2017 WL 65069 (Bankr. D. Del. Jan. 5, 2017)) ......................15, 16, 17

*In re Spitko*, 2007 WL 1720242 (Bankr. E.D. Pa. June 11, 2007)................................29

*In re Syntax-Brillian Corp.*, 573 F. App'x 154 (3d Cir. Aug. 11, 2014) .....................28

*In re TEU Holdings*, 287 B.R. 26 (Bankr. D. Del. 2002) ..............................................43

*In re The Brown Schools*, 368 B.R. 394 (Bankr. D. Del. 2007) ...................................15, 41, 42

*In re Total Containment, Inc.*, 335 B.R. 589 (Bankr. E.D. Pa. 2005) .........................17, 44

*In re Tribune Co.*, 464 B.R. 126 (Bank. D. Del. 2011) ..................................................................30

*In re Troll Commc'ns. LLC*, 385 B.R. 110 (Bankr. D. Del. 2008)).............................................17, 23

*In re TSIC, Inc.*, 428 B.R. 103 (Bankr. D. Del. 2010) ..................................................................37

*In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005)............................................13

*In re Wash. Mut., Inc.*, 2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ................................40

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179  (Del. Ch. Oct. 20, 2014) .............................................................................................................................................13

*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992)...........................................35

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010)............................................................................41

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)................................................12, 25

*Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007) ......................................................................43

*Schock v. Nash*, 732 A.2d 217 (Del. 1999)..................................................................................41

*Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362 (Del. 2006) .........................................13

*William Penn P'Ship v. Saliba*, 13 A.3d 749 (Del. 2011) ............................................................14

## STATUTES

11 U.S.C. § 544.....................................................................................................................11, 28

11 U.S.C. § 547.............................................................................................................11, 38, 40

11 U.S.C. § 548....................................................................................................... *passim*

11 U.S.C. § 550.............................................................................................................12, 39, 40

6 Del. C. § 1304 ............................................................................................................11, 28, 31

6 Del. C. § 1305 .....................................................................................................................11, 31

6 Del. C. § 1309 ...........................................................................................................................28

6 Del. C. § 18-1101(e) ................................................................................................................16

## RULES

Federal Rule of Civil Procedure 9(b)...........................................................................................28

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1, 12, 23

Federal Rule of Civil Procedure 15(a)(2) ....................................................................................44

Plaintiff George L. Miller, the Chapter 7 Trustee ("Plaintiff," or the "Trustee") for the jointly administered Chapter 7 bankruptcy estates of W.J. Bradley Company Merchant Partners 2003-SEED, LLC ("WJB SEED"), W.J. Bradley Mortgage Capital, LLC ("WJB Mortgage Capital"), W.J. Bradley Corporate Services, LLC ("WJB Corporate Services"), W.J. Bradley Financial Services, LLC ("WJB Financial Services"), and WJB Mortgage Services, LLC ("WJB Mortgage Services") (collectively, the "WJB entities," "WJB," or the "Debtors"), by and through his counsel, hereby responds to the Motions to Dismiss filed by Defendants Joseph Cambi ("Cambi"), Springfield Capital, LLC ("Springfield"), William Bradley ("Bradley"), Daniel Baruch ("Baruch"), Howard Michalski ("Michalski"), Gerard Levins ("Levins") and Audrey Kirdar ("Kirdar") (collectively, the "Moving Defendants").

## I.    NATURE AND STAGE OF THE PROCEEDING

The Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code on April 28, 2016 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware. The cases are being jointly administered under the caption *In re W.J. Bradley Mortgage Capital, LLC, et al.*, U.S.B.C. D. Del., Case No. 16-11049 (KG). Plaintiff George L. Miller is the duly-appointed Chapter 7 Trustee of the Debtors. On April 16, 2018, the Trustee commenced the instant adversary proceeding by filing the Complaint, which asserts claims for relief under the Bankruptcy Code and state law against Defendants. The Moving Defendants responded to the Complaint by filing motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (applicable here pursuant to Federal Rule of Bankruptcy Procedure 7012) to which the Trustee objects and responds herein. The remainder of the Defendants filed Answers to the Complaint and have not moved to dismiss.

## II.    INTRODUCTION

Defendants wholly abandoned their fiduciary duties to the Debtors in order to force through a transaction that resulted in the almost immediate destruction of the Debtors.  At the same time that this transaction was being negotiated, the Debtors transferred millions of dollars to insiders that rightfully belongs to the bankruptcy estate.  The Complaint thus seeks recovery for (a) breaches of fiduciary duties in connection with the approval of the redemption of the entire interest in Debtor WJB owned by Defendant ASD Merchant Partners LLC ("ASD") for a value far in excess of the fair market value of that interest (the "Redemption Transaction"); and (b) certain other fraudulent and/or preferential transfers that were made to the detriment of creditors.  The latter include outrageously excessive board fees and unwarranted bonuses paid to the Debtors' managers (including Defendant Cambi), coupon and dividend payments to certain insider investors (including Defendants Bradley, Cambi, and Cambi's Springfield entity), and millions in preferential loan repayments made to Cambi's Springfield entity, for the benefit of Cambi, all coming as the Debtors were on the brink of collapse.  The Complaint also seeks recovery under theories of aiding and abetting breaches of fiduciary duties, unjust enrichment and corporate waste, claims for all of which are stated in the detailed allegations in the Complaint.

Defendant Arthur S. Demoulas ("Demoulas") and the entities he controls, who received the $25 million in transfers from the Redemption Transaction, have not moved to dismiss the Complaint.  However, several of the other Defendants, who also breached their fiduciary duties and/or received fraudulent transfers as the company was being driven into the ground, have moved to dismiss the claims against them.

2

The Trustee has adequately alleged each and every one of his claims.  The Complaint is replete with allegations detailing how the Redemption Transaction was going to devastate the Debtors (and how Defendants knew that before the transaction took place), but that Defendants Bradley and Cambi did it anyway because they wanted to rid themselves of Demoulas, not because it was in the best interests of Debtors.  The Complaint alleges in detail the bitter relationship between Cambi and Bradley (on the one hand) and Demoulas (on the other hand) that led to the consummation of the disastrous Redemption Transaction. The other Defendants simply rubber-stamped this transaction even though they knew or should have known it was not in the best interests of the company.

Debtors paid Demoulas $25 million for his shares, even though Defendants knew all along that the shares were worth, at best, no more than $17 million.  And in reality, the shares were worth absolutely nothing to WJB because as soon as it bought them, the company simply did not have enough cash to operate, and collapsed.  Moreover, the Debtors (at the direction of Defendants) repeatedly doled out money to insiders even as the Debtors were heading toward their death spiral.  Cambi's salary for serving on the Debtors' Board of Managers increased from $60,000 annually to a whopping ***$750,000 per year*** in the two years leading up to the Debtors' demise, even as he worked to cause that demise through the Redemption Transaction.  Cambi and his shell entity, Springfield, also received millions of dollars in dividends and loan payments during the years leading up to the Debtors' bankruptcy.

Moving Defendants' arguments all miss the mark.  They argue that they are shielded from liability for their breaches of fiduciary duty by an exculpatory clause purportedly contained in the Debtors' operating agreement, and/or by the business judgment rule.  However, these are

3

affirmative defenses that do not provide a basis for dismissal, and require fact-specific analyses that are premature at the pleading stage.  And in any event, the Trustee's Complaint pleads around the business judgment rule by detailing extensively the Defendants' roles in causing the collapse of the company to achieve their own personal interests.  Those interests include Bradley's and Cambi's desire (stated repeatedly in emails, quoted at length in the Complaint) to stop being Demoulas's "slave," and the acquiescence of the rest of the Defendants to the whims of Bradley, Cambi and Demoulas.  Moving Defendants' argument that the Debtors only paid $16 million in the Redemption Transaction is utterly without merit, is factually inaccurate, and is based on extrinsic factual contentions not contained in the Complaint.  Even accepting Defendants' contention that Springfield made a $9 million contribution *in return for capital in the company*, those funds still constitute property of the Debtors.  As alleged in the Complaint, the Debtors paid $25 million, transferred directly from Debtor WJB SEED to Demoulas or entities he controlled.  Defendants' suggestion that the Complaint somehow misleads the Court is baseless and entirely unwarranted.

The Complaint also alleges all of the required elements of the applicable statutes for each of the many fraudulent transfers that were made to insiders as WJB plunged toward its ultimate collapse.  In response, Moving Defendants can only raise factual disputes not ripe for determination on the motion to dismiss stage, such as arguments about the date of onset of insolvency and whether the transfers were for reasonably equivalent value.

In short, Moving Defendants attempt to distract the Court from the Complaint's well-pleaded allegations by arguing their cases at the motion to dismiss stage.  Desperate to deny the Trustee the opportunity to develop his case in discovery, Moving Defendants go so far as to

inappropriately attach various documents to their Motions that are clearly extrinsic to the Complaint and not relevant to the claims.  Of course, at the pleading stage the Court must accept the Trustee's allegations as true and construe them in the light most favorable to him.

Moving Defendants' Motions should be denied.

## III.    STATEMENT OF FACTS

In the years immediately preceding the Debtors' Chapter 7 filings, Defendants abandoned their duties to the Debtors by approving the Redemption Transaction, and by causing the Debtors to make other excessive payments to insiders, allowing these insiders, including Defendants themselves, to treat the Debtors as their personal piggy bank.  Complaint (D.I. 1) ("Compl.") ¶ 2. In all, Defendants caused the Debtors to pay over $36 million in fraudulent and preferential transfers to insiders, which transfers include, *inter alia*, the following:

a.    Purchasing the equity interests of ASD, which is controlled by Demoulas, a member of Debtors' Board of Managers, for $25 million in the Redemption Transaction, an amount which Defendants knew was nearly twice its market value, at a time when the payment even of fair market value would have crippled the operations of the then-vulnerable Debtors.  The value of the shares was in reality $0, as the Redemption Transaction caused a death spiral that led to WJB's bankruptcy;

b.    Paying over $1.2 million each in excessive board fees to insider Defendants Cambi and Demoulas, after the Board of Managers of Debtor WJB-SEED authorized an increase to Demoulas's and Cambi's board fees from a reasonable $60,000 annually to a staggeringly high $750,000 annually;

c.    Paying over $1.4 million in cash dividend payments to Defendant Springfield, which was controlled by insider Cambi;

d.    Making over $5 million in payments to Springfield (for the benefit of Cambi) to repay principal and interest on loans made by Springfield, as Debtors were teetering on the brink of collapse;

e.    Making $1.7 million in dividend distributions to insiders, including over $1.1 million to Demoulas and nearly $500,000 to Springfield (for the benefit of Cambi);

f. Paying over $86,000 each to Defendants and WJB managers and insiders Kirdar and Levins (the "Kirdar Bonus" and the "Levins Bonus," respectively) for their time spent related to the Redemption Transaction, which in reality, offered no value to the Debtors and only furthered the goals of Demoulas and the other Defendants, and led to the demise of WJB.

*Id.*

Bradley was President and Chief Executive Officer ("CEO") of WJB and a member of the WJB Board of Managers (the "Board"). *Id.* ¶ 9. Cambi was Chairman of the Board of WJB – and thus a Manager of WJB – and President and Manager of Defendant Springfield, which was a member of WJB. *Id.* ¶ 10; Compl. Ex. A. Levins and Kirdar were both members of the Board of WJB, and they were appointed as such by Demoulas. *Id.* ¶¶ 12-13. Baruch was Chief Operating Officer and Senior Managing Director of WJB. *Id.* ¶ 14. Michalski was Executive Managing Director of WJB. *Id.* ¶ 15.

### A. The Redemption Transaction

The original W.J. Bradley Company was founded in 1999. In 2003, Bradley and Cambi launched W.J. Bradley Merchant Partners, LLC with plans to effect a large-scale consolidation strategy in the residential mortgage industry. *Id.* ¶ 21. As a result of the housing crisis, WJB Mortgage Partners consolidated its portfolio of companies and restructured in 2007 and 2008, as a result of which Demoulas, through Defendant ASD Merchant Partners LLC ("ASD"), acquired a 65% controlling share of WJB. *Id.* Bradley and Cambi found Demoulas to be impossible to work with, and were never able to fully come to grips with their loss of control over the company, or with the control enjoyed by Demoulas. *Id.* ¶ 23.

On or about March 17, 2015, Demoulas agreed to sell ASD's stake in WJB to Cambi for $25 million. *Id.* ¶ 32. On April 2, 2015 a Membership Interest Purchase Agreement ("MIPA") was entered into between Springfield, ASD and WJB, under the terms of which, Springfield was

to purchase ASD's 65% membership interest in WJB for $25 million.  *Id.* ¶ 37.   The parties then

began to negotiate the details of a transaction that would result in Bradley, Cambi and/or WJB

buying out ASD's 65% interest and removing Demoulas from the Board.  The sale contemplated

by the original MIPA was heavily renegotiated over the next 8 months.  During that period, the

structure changed, as WJB decided to redeem ASD's entire membership interest in lieu of

Springfield purchasing it.  *Id.* ¶ 44.

As alleged in the Complaint, the major driver for negotiating and completing the

Redemption Transaction, from Bradley's and Cambi's point of view, was that they wanted

Demoulas out of their lives.  Demoulas simply wanted to receive $25 million for his interest in

WJB, regardless of its true value.  *Id.* ¶¶ 33, 35.  Just after Cambi and Demoulas agreed to the

$25 million price, Cambi and Bradley celebrated the potential that their 7 years of "slavery" to

Demoulas would soon be over.  *Id.* ¶ 33.  The intense desire to rid themselves of Demoulas

continued to drive Bradley and Cambi as they spent the rest of 2015 working on completing the

Redemption Transaction and ending Demoulas's involvement with WJB.  *Id.* ¶ 34.  Bradley,

Cambi and Demoulas worked throughout 2015 to achieve their respective personal goals with

regard to completing the Redemption Transaction, while ignoring the interests of WJB, to which

they owed fiduciary duties.  *Id.* ¶ 36.

Bradley, Cambi and the other Defendants were aware that the shares owned by ASD

were worth far less than $25 million.  *Id.* ¶ 39.  In March 2015, investment bankers Houlihan

Lokey ("HL") completed a presentation to the WJB board, which outlined certain guidelines for

estimating the value of WJB.  The HL presentation gave an approximate valuation of $26.6

million for the entirety of WJB.  Based on a $26.6 million valuation for the entire company,

ASD's 65% interest was worth just over $17 million.  *Id.* ¶ 41.  Bradley was aware of, and agreed with, this valuation.  *Id.* ¶ 42.

As Bradley pointed out in an email, the $25 million price had no connection to a true market value and was based simply on what Demoulas demanded.  *Id.* ¶ 43.  As WJB Chief Financial Officer Roy Browning noted in an email, "Just because ASD and Springfield agreed the price for 65% is $25M, it is not an arm's length transaction . . . .  Only an independent third party will be able to determine a range of likely values."  *Id.*  Such an independent valuation was never done.

While negotiating the transaction, Cambi, Bradley and the other Defendants were aware that the $25 million sale price would leave WJB with very little, if any, cash to operate.  Cambi remarked on November 10, 2015 that "we are putting every penny on the line getting ASD what we said we would . . . ."  *Id.* ¶ 48.  And Jason Schendel, attorney for WJB, wrote "I understand that Springfield is tapped out and WJB is obviously squeezing every dollar possible into the redemption."  *Id.* ¶ 49.

In reality, the Board and the Officers of Debtors, including the Moving Defendants, knew, or should have known, that the true value of ASD's shares, in the context of the Redemption Transaction, was actually $0.  It was a worthless asset once the Redemption Transaction was executed because the company immediately collapsed and had virtually zero cash flow within 30 days of the closing of the Redemption Transaction.  *Id.* ¶ 52.  This result either was, or should have been, evident to Defendants before they ever entered into the Redemption Transaction.  *Id.*

The Redemption Transaction finally closed on December 9, 2015.  The redemption price was the same $25 million as the original planned purchase price, despite the fact that the financial condition of WJB had worsened through 2015.  *Id.* ¶ 55.  The Redemption Transaction consisted of five separate transfers totaling $25 million made on December 9, 2015 by Debtor WJB SEED to Demoulas or entities he controlled.  *Id.* ¶ 56.  While Cambi's Springfield entity contributed some money to Debtors, in exchange for equity, the entirety of the $25 million in transfers was made directly by Debtor WJB SEED.  *Id.*

### B.  WJB Went Into a Death Spiral Immediately Following the Redemption Transaction

The poor financial condition of WJB leading up to the Redemption Transaction became almost instantly evident after the transaction was closed.  Within weeks, the company was scrambling for cash.  *Id.* ¶¶ 61-63.  By the end of January, Bradley acknowledged in an email that his hyper-focus on buying Demoulas out had rendered him unable to address the other issues facing the company.  *Id.* ¶ 68.  As Chief Operating Officer and Executive Managing Director, respectively, of WJB, Defendants Baruch and Michalski did nothing to intervene in the negotiations or ensure that the Redemption Transaction was in the best interests of WJB.  *Id.* ¶ 70.  Likewise, Levins and Kirdar approved the transaction, despite its clearly devastating effect on the Debtors.  *Id.* ¶ 73.

By February 2016, WJB was, *inter alia*, failing to fund loans, and unable to repay its obligations to lenders in connection with the Redemption Transaction.  *Id.* ¶ 75.  On March 13, 2016, the Board executed a formal resolution determining that an orderly wind-down of operations and a Chapter 7 bankruptcy filing was necessary and the best course of action for creditors.  *Id.* ¶ 76.  On April 28, 2016, WJB commenced its bankruptcy filing.  *Id.* ¶ 77.

### C.  Other Fraudulent and/or Preferential Transfers

In addition to the transfers associated with the Redemption Transaction, other transfers made prior to the Petition Date constitute fraudulent transfers and represent breaches of fiduciary duty, as alleged in the Complaint.  Many of these transfers are not subject to the pending Motions to Dismiss.  The following *are* subject to the Motions:

#### 1.  Excessive Board Fees to Cambi

During the time that they negotiated and closed the Redemption Transaction that destroyed WJB, Cambi and Demoulas were paid excessive and unwarranted fees for their participation on the WJB Board of Managers.  In total, they received $1,207,500 in excessive board fees (the "Excessive Board Fees") during the two years prior to the Petition Date.  *Id.* ¶¶ 79-84.  The increases were made with little or no discussion or deliberation by the Board.  WJB received nothing in return for these unnecessary and unsupported increases in the board payments.  *Id.* ¶ 84.  Demoulas has not moved to dismiss the Trustee's fraudulent transfer claims relating to the excessive fees paid to him, but Cambi has so moved.

#### 2.  Coupon Payments to Springfield Capital

During the two years prior to the Petition Date, Cambi, though Springfield, received monthly cash dividends from WJB of $71,875.  *Id.* ¶ 90.  Given the financial condition of WJB during that period, these dividends were unreasonable and constitute fraudulent transfers.  The payments (the "Springfield Coupon Payments") totaled $1,463,472.22.  *Id.*

#### 3.  Loan Payments to Springfield

In the year leading up to the bankruptcy petition, while Debtors were foundering, WJB made over $5 million in transfers to Springfield in interest and principal payments on loans that

Springfield had made to Debtors (the "Springfield Loan Payments"), which gave Springfield unfair and unwarranted preferential treatment over other creditors. *Id.* ¶¶ 30, 93-98.

### 4.   Payments of Dividends to Members

On April 12, 2013, WJB SEED paid out $1,114,419.70 in dividends to Demoulas, $459,056.86 to Springfield (the "Springfield Dividend") and $45,183.38 to Bradley ("the Bradley Dividend"). *Id.* ¶ 99.

These distributions (the "April 2013 Dividends") were approved via a special telephonic meeting on March 21, 2013. Given the financial condition of WJB at that time, and the insider status of the recipients, these dividends constituted fraudulent transfers. *Id.* ¶ 100. Demoulas has not moved to dismiss the claim against him for recovery of the dividend paid to him, but Bradley and Cambi have so moved.

### D.  The Complaint

The Complaint alleges the following counts against the various Defendants:

- **COUNT 1** – Breach of Fiduciary Duty against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski;

- **COUNT 2** – Avoidance of Transfers pursuant to 11 U.S.C. § 548(a)(1)(A) (Actual fraudulent transfer) against Cambi, Demoulas, Levins, Kirdar, Peter Picknelly ("Picknelly"), Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust;

- **COUNT 3** – Avoidance of Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) (Constructive fraudulent transfer) against Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust;

- **COUNT 4** – Avoidance of Transfers pursuant to 11 U.S.C. § 547(b) (Preferences) against Cambi and Springfield;

- **COUNT 5** – Avoidance of Transfers pursuant to 6 Del. C. §§ 1304, 1305 and 11 U.S.C. § 544 against Bradley, Cambi, Demoulas, Levins, Kirdar, Picknelly,

11

Springfield, ASD, the ASD Continuation Trust, and the ASD 2012 Trust;

- **COUNT 6** – Recovery of Transfers under 11 U.S.C. § 550 against Bradley, Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust;

- **COUNT 7** – Aiding and Abetting Breach of Fiduciary Duty against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski;

- **COUNT 8** – Corporate Waste against Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski;

- **COUNT 9** – Unjust Enrichment against all Defendants.

Defendants filed a total of four Motions to Dismiss:

- Kirdar and Levins jointly filed a Motion to Dismiss Counts 1, 7, 8 and 9 as those apply to Kirdar's and Levins's role in the Redemption Transaction only (the "Levins/Kirdar Br."). They have not moved to dismiss Count 1 (Breach of Fiduciary Duty) as it relates to their acceptance of the Levins and Kirdar Bonuses, nor have they moved to dismiss Counts 2, 3 and 5.

- Bradley, Baruch and Michalski jointly filed a Motion to Dismiss the claims against them (the "Bradley/Baruch/Michalski Br.").

- Cambi filed a Motion to Dismiss the claims against him (the "Cambi Br.").

- Springfield filed a Motion to Dismiss the claims against it (the "Springfield Br.").

Defendants Demoulas, ASD, the ASD Continuation Trust, the ASD 2012 Trust and

Picknelly filed Answers and have not moved to dismiss the claims against them.

## IV.    LEGAL STANDARD

In ruling on a motion to dismiss pursuant to Rule 12(b)(6) (applicable here pursuant to

Federal Rule of Bankruptcy Procedure 7012), the court must "accept all factual allegations as

true, construe the complaint in the light most favorable to the plaintiff, and determine whether,

under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v.*

*County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). "To survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## V.    ARGUMENT

### A.  The Complaint Sufficiently Alleges Breaches of Fiduciary Duty Against Each Moving Defendant

Under Delaware law, fiduciary duties encompass duties of care, loyalty, and good faith.

*In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32-33 (Del. Ch. 2014).  The duty of

care requires fiduciaries to manage the company with the "care which ordinarily careful and

prudent men would use in similar circumstances" and not act with gross negligence.  *In re Walt

Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

The duty of loyalty (within which the duty of good faith is subsumed) requires fiduciaries to

avoid financial or other cognizable fiduciary conflicts of interest.  *Stone ex rel. AmSouth

Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *Lake Treasure Holdings, Ltd. v. Foundry Hill

GP LLC*, 2014 WL 5192179, at *10 (Del. Ch. Oct. 20, 2014); *see also Cede & Co. v.

Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best

interest of the corporation and its shareholders takes precedence over any interest possessed by a

director, officer or controlling shareholder and not shared by the stockholders generally.").[1]

Some of the Moving Defendants argue that they did not owe fiduciary duties to the

Debtors.  Each of the Moving Defendants further argues that even to the extent he or she owed

---

[1] Cases involving LLCs "have generally, in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC members as owing each other the traditional fiduciary duties that directors owe a corporation," and thus "traditional corporate jurisprudence applies."  *See* Levins/Kirdar Br. at 10 n. 4 (*citing Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009)).

13

fiduciary duties, (a) those duties were exculpated to some extent by WJB's formation documents, (b) Defendants are entitled to the protections of the business judgment rule, and/or (c) Plaintiff has not adequately alleged a breach of any duty.  All of these arguments lack merit.

### 1. The Moving Defendants Each Owed Fiduciary Duties to the Debtors

As members of the WJB Board of Managers, Bradley, Levins, Kirdar and Cambi clearly owed fiduciary duties of care, loyalty and good faith to WJB.  *See e.g.*, *William Penn P'Ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011) ("[M]anagers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement.") (*citing Bay Ctr. Apts.*, 2009 WL 1124451, at *8).  Bradley, Levins and Kirdar do not deny that they were managers of WJB, who therefore owed fiduciary duties to Debtors.  Moreover, Levins and Kirdar do not move to dismiss the claim for breaching their fiduciary duties by accepting the Levins and Kirdar Bonuses, moving only to dismiss the claim for breaches of fiduciary duty relating to the Redemption Transaction.  *See* Levins/Kirdar Br. at 2 n.2.  Cambi, however, argues that the Complaint does not allege he was a manager of Debtors. This is simply false.  The Complaint alleges that "Cambi was Chairman of the [WJB Board of Managers]."  Compl. ¶ 10.  The Complaint also defines Cambi as an "Officer and Manager Defendant" and specifically alleges that such Defendants owed fiduciary duties.

*Id.* ¶¶ 2, 102.  Cambi's hands-on role in managing the affairs of the Debtors is evident in the allegations made throughout the Complaint, including his founding of the company, role in negotiating the Redemption Transaction, and knowledge of WJB's financial condition.  The Complaint therefore clearly alleges that Cambi owed fiduciary duties to the Debtors.

14

Baruch and Michalski are alleged to have been officers of WJB, who thus owed fiduciary duties.  Compl.  ¶¶ 14-15, 102.  To the extent that those duties did not attach until some point later in the chain of events, as Defendants argue, this is an issue to be determined in discovery. Moreover, Baruch and Michalski were clearly in a position to aid and abet the breaches of fiduciary duties by other Defendants.  *See* § V.C *infra*.

## 2.  Moving Defendants' Purported Exculpation Affirmative Defense Cannot Be Resolved at the Pleading Stage

Bradley, Baruch and Michalski (and to some extent Cambi, Levins and Kirdar) argue that WJB's Operating Agreement exculpates them from liability for any of the breaches of fiduciary duty the Trustee alleges.  But the effect of an exculpatory provision cannot be determined at the motion to dismiss stage.  *In re The Brown Schools*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) ("The exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage."); *see also In re Liquid Holdings Group, Inc.*, 2018 WL 2759301, at *12 (Bankr. D. Del. June 6, 2018) (same) (*citing In re Simplexity, LLC*, 2017 WL 65069, at *6 (Bankr. D. Del. Jan. 5, 2017)).[2]  Moreover, Delaware law does not permit elimination of *all* fiduciary duties.  LLCs are expressly prohibited from eliminating liability for a fiduciary's failure to act in good faith.  *See* 6 Del. C. § 18-1101(e).  For this reason, "[i]n cases

---

[2] The Operating Agreement cited by Moving Defendants and attached to their Briefs is an extrinsic document that is not sufficiently integral to the Trustee's breach of fiduciary duty claim for the Court to properly consider it on a motion to dismiss.  "It is not enough that a putatively integral document be critical for an affirmative defense, or bear on an essential element of the claim.  The rule [permitting consideration of integral documents] is applied when the claim would not exist but-for the existence of the document."  *Dix v. Total Petrochemicals USA, Inc.*, 2011 WL 2474215, at *1 (D.N.J. June 20, 2011).  WJB's formation documents may be integral to determining the merit of the Defendants' affirmative defense, but they are *not* integral to the Trustee's Complaint in a manner that would allow consideration of their scope and applicability on a motion to dismiss.  *See id.* at *2; *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 273-74 (3d Cir. 2016).

where a court may consider an exculpatory clause, the exculpation provision analysis is limited

to violations of the duty of care," and such clauses may not eliminate the duty of loyalty. *Liquid*

*Holdings*, 2018 WL 2759301, at *12 (*citing Simplexity,* 2017 WL 65069, at *6). Thus, even

assuming that the LLC Agreement effectively modified or restricted liability for certain duties, it

did not (and could not) eliminate them entirely.

Moving Defendants point to language in the Operating Agreement purportedly providing

that "if a Manager performs his or her duties *without gross negligence or willful misconduct*,

then he or she shall not have any liability by reason of being or having been Manager of the

Company." *See* Bradley/Baruch/ Michalski Br. at 12 (citing Operating Agreement attached as

Exhibit D to their Brief). But even assuming this language is applicable here, it would not

eliminate all liability for the Trustee's claims. Indeed, rather than eliminating liability, as

Moving Defendants contend, this provision reinforces the continuing existence of their fiduciary

duties, and their liability for breaches thereof. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664

(Del. Ch. 2012) (LLC Agreement's elimination of liability unless conduct amounted to gross

negligence or willful misconduct did not limit or eliminate fiduciary duties, but instead

"recognize[d] their continuing existence," because "[g]ross negligence is the standard for

evaluating a breach of the duty of care" and "[w]illful misconduct is one standard for evaluating

whether a fiduciary breached the duty of loyalty").

It would be premature and inappropriate at this stage to make piecemeal factual

determinations as to the applicability and scope of the exculpation defense raised by Moving

Defendants, particularly in light of the significant duty of care, loyalty, and good faith violations

alleged in the Complaint. *See In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 568 (Bankr. D.

16

Del. 2008) (*citing Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *8 (Del. Ch. Nov. 6, 2002)) (where allegations implicate breach of the duty of loyalty and a lack of good faith, in addition to breach of the duty of care, dismissal based upon an exculpatory provision is not appropriate); *see also In re Direct Response Media, Inc.*, 466 B.R. 626, 650-51 (Bankr. D. Del. 2012) (same).

### 3. The Complaint Sufficiently Alleges Breaches of Fiduciary Duty by Each Defendant and Defendants are Not Protected by the Business Judgment Rule

The business judgment rule presumes that a fiduciary's decisions are made on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the company.  *See, e.g.*, *Orchard Enters.*, 88 A.3d at 33-34.  Applicability of the business judgment rule is an affirmative defense to be developed after discovery, and typically is not appropriate for determination at the motion to dismiss stage.  *In re Total Containment, Inc.*, 335 B.R. 589, 606-07 (Bankr. E.D. Pa. 2005); *Simplexity*, 2017 WL 65069, at *8 ("The difficulty with the business judgment rule arguments by the Defendants is that the rule is also an affirmative defense and not to be considered on a Rule 12(b)(6) motion to dismiss.").

Moreover, a plaintiff may "plead around the business judgment rule" by plausibly alleging violation of "any one of [the] triad of fiduciary duties: due care, loyalty, or good faith." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 471 (Bankr. D. Del. 2017) (*citing In re Troll Commc'ns. LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008)).  Allegations that "raise a reason to doubt that [director] action was taken in good faith or on an informed basis" suffice to rebut the presumption of the business judgment rule.  *Buckley v. O'Hanlon*, 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007).  The Complaint plausibly alleges breaches of fiduciary duty against each of the Moving Defendants and the business judgment rule is rebutted.

17

### a. The Complaint States a Claim Against Bradley for Breach of Fiduciary Duties

The Complaint is replete with allegations of facts sufficient to state a claim that Bradley violated his duties of loyalty, care and good faith.  Bradley repeatedly and continuously ignored the best interests of Debtors in order to act in his own personal interest of removing Demoulas from the Board  *See, e.g.*, Compl. ¶¶ 1-2, 33-36, 39, 42-48, 51, 54, 68-69, 106, 114.  Thus, even though he may not have received a personal ***financial*** benefit from negotiating, directing, completing and executing the Redemption Transaction that spelled the Debtors' demise, he did accomplish his express goal of escaping his perceived "slavery" to Demoulas (at any cost and at the expense of WJB).  *See id.* ¶ 33.  The Complaint alleges that the "major driver" for Bradley and Cambi to complete the Redemption Transaction was to get Demoulas out of their lives.  *Id.* Bradley wrote an email to Cambi saying that he spent a year and half "committed to getting Arthur out."  *Id.* ¶ 34.  And the Complaint details email after email in which Bradley states that he put his concerns about getting Demoulas out of the company ahead of any concerns he had about the company itself.

Bradley and Cambi both "were aware" that the shares owned by ASD were worth far less than $25 million – indeed Bradley plainly admits as much in an email.  *Id.* ¶ 39; ¶ 42 (September 3, 2015 email from Bradley: "I don't believe that the ASD stock is worth more than $17.55M.").  This conduct – knowingly overpaying Demoulas for ASD's shares, focusing on closing the Redemption Transaction to the exclusion of other interests of the Debtors, and allowing his animus for Demoulas to override any concerns for the Debtors – constitutes a clear violation of the duty of loyalty and a failure to act in good faith.  *See Cede & Co.*, 634 A.2d at 362 (a director is "independent only when the director's decision is based entirely on the corporate merits of the

18

transaction and is not influenced by personal or extraneous considerations") (citations omitted); *Stone*, 911 A.2d at 370 ("[A] director cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest.") (*quoting Guttman v. Huang*, 823 A. 2d 492, 506 n.34 (Del. Ch. 2003)).

Bradley's conduct also constituted gross negligence, and thus a violation of the duty of care.  The Complaint alleges that Bradley knew or should have known that the real value of ASD's shares was $0 because it was a worthless asset once the Redemption Transaction was concluded.  Compl. ¶ 52.  The company ran out of cash in just a matter of weeks.  *Id.* ¶ 65. Bradley's failure to recognize this represents gross negligence and a violation of the duty of care. He himself acknowledged in an email to Cambi that his complete focus on buying out Demoulas had taken all of his focus and rendered him unable to address other issues facing the company. *Id.* ¶ 68.  The Complaint also alleges that Bradley did not begin to extensively investigate the cash position of WJB until *after* the Redemption Transaction was completed, at which point he wrote numerous emails to the company's financial officers pressing them on issues relating to WJB's cash flow.  *Id.* ¶ 64.  In short, Bradley either closed on the Redemption Transaction knowing it would leave the Debtors cash-poor and unable to operate, or in the alternative, he failed to ascertain the full cash position of WJB prior to closing on the Redemption Transaction. Either constitutes gross negligence and a violation of the duty of care.

### b. The Complaint States a Claim Against Cambi for Breach of Fiduciary Duties

The Complaint alleges that Cambi breached the duty of loyalty in the same ways as Bradley, because like Bradley he allowed his desire to remove Demoulas to guide his decision-making.  Like Bradley, Cambi himself wrote a number of emails making clear his true motives.

19

Cambi, for instance, complained about the "inordinate buffeting" he and Bradley received from

Demoulas. *Id.* ¶ 24.  He expressed "pain, frustration, anger and incredulity" at what he perceived

to be slights perpetrated by Demoulas against him and his friend Bradley. *Id.* ¶ 25.  He lamented

that Demoulas had left Bradley and him "zero influence" on their futures and noted that Bradley

and his team "were forced to slavishly serve [Demoulas] while I became instantly emasculated."

*Id.* ¶ 33.  He opined that he and Bradley were smart to do "whatever it takes" to get Demoulas

out and that they had "no choice" but to do so. *Id.* ¶ 34.  He confirmed that the company was

"putting every penny on the line" to get rid of Demoulas. *Id.* ¶ 48.

While Cambi's emails repeatedly express his extreme unease about what he and Bradley

perceived to be their difficult personal situation with respect to Demoulas, the emails notably fail

to show any concern for the company, and how their actions might affect it.  As with the

Trustee's allegations against Bradley, these allegations of carelessness, disloyalty and lack of

good faith on the part of Cambi sufficiently state a claim for breach of fiduciary duty.

Cambi argues that the Complaint merely "lumps" him in with other Defendants and does

not sufficiently allege that he caused the Debtors to make the improper payments associated with

the Redemption Transaction. *See* Cambi Br. at 10-11.  This argument fails.  Over and over

again, the Complaint alleges, often through Cambi's own words, his significant and leading role

in negotiating, completing and approving the Redemption Transaction and in otherwise running

the business of the Debtors. *See, e.g.*, Compl. ¶¶ 34, 35, 45, 62.

Additionally, each time Cambi accepted an Excessive Board Fee payment, this

constituted a breach of his fiduciary duties.  As alleged, as an insider and manager of the

company, Cambi accepted fees that were paid to him that far exceeded the value of the job he

did.  The fees increased from $60,000 per year to an extraordinary $750,000 per year in a mere

eight-month period.  *Id.* ¶ 81.  This tremendous increase in fees – made prior to and during the

period in which the company was collapsing as a result of Cambi's actions – was clearly

excessive and unwarranted.  The cases Cambi cites on this point are distinguishable.  In *In re Pitt*

*Penn Holding Co.*, 484 B.R. 25, 54 (Bankr. D. Del. 2012), the complaint did not even identify

the dollar amount of the supposedly excessive compensation.  And in *In re AgFeed USA, LLC*,

558 B.R. 116, 130 (Bankr. D. Del. 2016), the court actually recognized that "[a]llegations

showing that payments are 'excessive or extraordinary …, *i.e.*, outside the normal rate,' may be

sufficient to overcome a motion to dismiss," but found that the complaint in that case did not

allege enough because it stated only that the new CEO's salary was twice as much as the old

CEO's.  Here, the Complaint specifically alleges that Cambi's board fees increased by nearly

$700,000 in less than a year, while the fees of the other board members stayed at $60,000, that

the increases were approved with little or no deliberation by the board, and that they were not

warranted by any change in duties.  Compl. ¶ ¶ 79-84.  This is sufficient to state a claim that their

acceptance was a breach of Cambi's fiduciary duties.

The breach of fiduciary duty claims relating to the Excessive Board Fees are not barred

by the statute of limitations.  First, the Complaint does not allege that the approval of the second

increase in board fees took place more than three years prior to the Petition Date.  Second, even

if it had, the Complaint alleges that the ***acceptance*** of each excessive fee payment constituted a

breach.  *Id.* ¶ 114(f).  Cambi's acceptance of the payments is clearly alleged to have taken place

within the limitations period.  *Id.* ¶ 81.

### c.  The Complaint States a Claim Against Levins and Kirdar for Breach of Fiduciary Duties

The Trustee alleges both that Defendants Levins and Kirdar breached their fiduciary duty of loyalty because they lacked independence and that they acted in bad faith by abdicating their managerial duties.  A director lacks independence when his decisions are based on "extraneous considerations or influences" rather than the merits of the transaction, such as when the director is "so beholden" to an interested party that his discretion is "sterilized."  *Cumming v. Edens*, 2018 WL 992877, at *12 (Del. Ch. Feb. 20, 2018).

ASD was entitled to designate three of the five members of WJB's Board of Managers. Compl. ¶ 72.  In addition to Demoulas himself, ASD designated Levins and Kirdar.  *Id.*  Levins even uses ASD's address as his own personal business address.  *Id.*  Rather than make any attempt to intervene in the negotiations, question the redemption price, or ensure that the Redemption Transaction was in the best interests of WJB, Levins and Kirdar instead worked only to further the goals of Demoulas, at the expense of WJB.  *Id.* ¶¶ 2.f, 73, 85-86, 89.  Levins and Kirdar both approved the Redemption Transaction, despite knowing that WJB (already financially vulnerable at the time) was paying at least $8 million more than the ASD shares were worth.  *Id.* ¶¶ 51, 73.  They both resigned from the Board, along with Demoulas, in connection with the Redemption Transaction.  *Id.* ¶ 87.

The issue of director independence arises both in the context of breach of fiduciary duty claims and in shareholder derivative actions (relating to demand futility).  While these concepts are related, and while substantive state law determines whether a director is "independent" in either instance, there is a significant difference between the pleading requirements for these types of claims – demand futility in a derivative action is evaluated in accordance with the heightened

22

pleading standard set forth in Federal Rule of Civil Procedure 23.1 (or Delaware's substantively similar Chancery Court Rule 23.1), which requires that demand futility be pled "with particularity." *Halpert v. Zhang*, 966 F. Supp. 2d 406, 411, 415 (D. Del. 2013); *see also Cumming*, 2018 WL 992877, at \*18.   Breach of fiduciary duty claims, such as those brought by the Trustee, are not.   They are subject to the "less stringent" pleading standard of Rule 12(b)(6). *Halpert*, 966 F. Supp. 2d at 415; *see also Troll Commc'ns.*, 385 B.R. at 118-20 (general allegations that board member was hired by other interested directors and was beholden to their interests were sufficient to "plead around the business judgment rule" and survive a motion to dismiss under Rule 12(b)(6)).   Thus, the Complaint does not, as Levins and Kirdar suggest, have to plead particulars that "raise a reasonable doubt" as to their independence.   *See* Levins/Kirdar Br. at 12.   That is the heightened standard used in the demand futility context, which is not applicable here.   *See Halpert*, 966 F. Supp. 2d at 412, 415; *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 256 n.13, 261 n.45 (Del. Ch. 2006).

The Trustee adequately alleges a breach of the duty of loyalty by Levins and Kirdar.   The Trustee alleges not only that they were appointed to the Board by interested party ASD, but also that they received large bonus payments for Board service that did not benefit WJB, and instead benefitted ASD and Demoulas.   These allegations, considered in conjunction with Levins's and Kirdar's failure to intervene in the ill-advised Redemption Transaction, plausibly suggest that Kirdar and Levins were beholden to the interests of ASD and Demoulas over those of WJB.   *See Troll Commc'ns*, 385 B.R. at 119.   Moreover, given their knowledge that the redemption price was well in excess of fair market value, their failure to intervene and subsequent approval constituted an abdication of their duties to WJB.   *See Bridgeport Holdings*, 388 B.R. at 565

(allegations that defendants abdicated crucial decision-making authority to Chief Operating Officer, failed to adequately monitor his activities, and then approved a sale for grossly inadequate consideration stated claim for breach of duty of loyalty).

### d.   The Complaint states a Claim Against Baruch and Michalski for Breach of Fiduciary Duties

As Chief Operating Officer and Executive Managing Director, respectively, Baruch and Michalski breached their fiduciary duties by failing to act to ensure the Redemption Transaction was in the best interests of WJB.  *See* Compl. ¶¶ 65, 69-70, 107.  They were aware of the negotiations that were occurring, yet abdicated any responsibility to the company in order to simply allow Bradley and Cambi to run the show without ever questioning it.  *See id.* ¶¶ 69-70.  In short, they violated their fiduciary duties because they "knew or should have known that violations of the law were occurring, they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result."  *Buckley*, 2007 WL 956947, at *3 (*citing In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)).

### e.   The Complaint Plainly Alleges that the Debtors Paid Far More than the Value of ASD's Shares in the Redemption Transaction

Bradley, Baruch and Michalski (and to a lesser extent Cambi) argue that there could be no breach of fiduciary duty in connection with the Redemption Transaction because the Debtors did not overpay for ASD's shares.  According to this argument, WJB only paid $16 million because the rest of the $25 million was paid from a contribution by Springfield.  This argument is factually incorrect and simply ignores the allegations in the Complaint.

First, Defendants' argument brings in facts extrinsic to the Complaint and therefore, as an initial matter, is not an appropriate issue for determination at this stage.  The Complaint clearly alleges that the Redemption Transaction was completed by means of five separate transfers

totaling $25 million *from Debtor WJB SEED* to entities controlled by Demoulas.  Compl. ¶ 56.

The Complaint even includes a table that details these transactions.  At the pleading stage, that is

the end of the inquiry.  Thus, for purposes of determination of the Motions to Dismiss, Plaintiff

has set forth facts showing that Debtors paid a total of $25 million, in five separate transfers, on

December 9, 2015.  *See Phillips*, 515 F.3d at 233 (the Court must "accept all factual allegations

as true" at the motion to dismiss stage).

However, even if the Court were to accept the factual premise of Defendants' argument,

which again is not appropriate at this stage, this still does not change the analysis here, as the

entire $25 million at issue constituted property of the Debtors.  Defendants admit the $9 million

contribution from Springfield was a "capital contribution," which means that Springfield

*received equity in the company in return*.  *See* Bradley/Baruch/ Michalski Br. at 21.  Springfield

did not simply contribute $9 million to the Redemption Transaction as a gift.  Once the $9

million capital contribution was made (in exchange for equity), that money was property of the

Debtor, which was then turned over in the Redemption Transaction.  So, the facts, both as

alleged in the Complaint, and even as inappropriately "alleged" by Bradley, Baruch and

Michalski in their Motion, support the fact that the Debtors' paid $25 million in the Redemption

Transaction.

Moreover, even if the Complaint were to allege that the Debtors only paid $16 million –

which it does not – the Complaint also alleges that the true value of ASD's shares was in reality

$0, because the company went out of business so shortly after the Transaction that the shares

were completely worthless once the transaction was completed.  Compl. ¶ 52.  And allegations

throughout the complaint show that the Defendants knew (or should have known) that the

transaction would bankrupt the company.  The Complaint thus alleges that the amount paid in the Redemption Transaction was well in excess of the true value of ASD's shares.

The suggestion by Bradley, Baruch and Michalski that the Trustee misled the Court through his allegations about the Redemption Transaction is nothing short of ridiculous.  No matter how many times Bradley, Baruch and Michalski state in their brief that the Debtors only paid $16 million, this does not make it accurate, nor a basis for dismissal.[3]  The Debtors' paid $25 million, and the Trustee made no attempt to, and had no need to, hide anything about this fact from the Court.

### B.  The Complaint Adequately Pleads Claims to Recover the Fraudulent Transfers

The Complaint sets forth sufficient allegations in support of numerous claims of fraudulent and/or preferential transfers.  With respect to many of those transfers, the Defendant recipients have *not* moved to dismiss those claims.  These include:

- The $25 million in Redemption Transaction payments to Demoulas-controlled entities;

- The Levins and Kirdar Bonuses;

- The Excessive Board Fees paid to Demoulas;

- The coupon payments paid to Defendant Peter Picknelly; and

- The Release included in the Redemption Transaction stating that the parties to the Redemption Transaction covenant to refrain from asserting certain claims.

---

[3] Bradley, Baruch and Michalski are particularly reliant on this baseless argument, as they raise it over and over again in their brief.  Their fellow Defendants apparently recognize that the argument is far from the sort of magic bullet that Bradley, Baruch and Michalski apparently wish it to be.  Cambi gives it just a brief mention in a short paragraph, Kirdar and Levins do not mention it at all in their brief, and Demoulas did not even file a motion to dismiss the claim for breach of fiduciary duty against him arising from the Redemption Transaction.

However, Cambi, Springfield and Bradley have moved to dismiss the fraudulent and preferential transfer claims brought against them as follows:

- Over $1.2 million in Excessive Board Fees to Cambi, which the Trustee seeks to avoid and recover pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), 548(a)(1)(B) and 550 and 6 Del. C. §§ 1304 and 1305;

- Over $1.4 million in coupon payments made to Springfield, made for the benefit of Cambi, which the Trustee seeks to avoid and recover pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A), 548 (a)(1)(B) and 550 and 6 Del. C. §§ 1304 and 1305;

- Over $5.2 million in preferential loan payments made to Springfield, made for the benefit of Cambi, which the Trustee seeks to avoid and recover pursuant to 11 U.S.C. §§ 544, 547(b), and 550 and 6 Del. C. §§ 1304 and 1305; and

- A $459,000 dividend payment to Springfield, made for the benefit of Cambi, and a $45,000 dividend payment to Bradley, which the Trustee seeks to avoid and recover pursuant to 11 U.S.C. § 544 and 6 Del. C. §§ 1304.

### 1. Counts 2 and 5 State Claims for Avoidance of the Cambi Excessive Board Fees, the Springfield Coupon Payments and the Springfield and Bradley Dividends as Actually Fraudulent

Fraudulent conveyance law exists "to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000). To this end, Congress has established a statutory framework by which transfers may be deemed fraudulent, and thus avoided by bankruptcy trustees. One way is through proving there was an actual fraudulent transfer under 11 U.S.C. § 548(a)(1)(A). Under that subsection, the trustee may avoid transfers of an interest of the debtor in property made within two years before the date of the filing of the bankruptcy petition, if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud" its creditors. The Excessive Board Fees to Cambi and the Springfield Coupon Payments are transfers of the

27

Debtors' property that were made within two years before the April 28, 2016 filing of the bankruptcy petition.

Delaware law likewise permits the recovery of actual fraudulent transfers.[4]  *See* 6 Del. C. § 1304(a)(1).  However, the Delaware Code permits recovery for fraudulent transfers that occurred up to ***four*** years prior to the filing of the Bankruptcy.[5]  *See In re Nat'l Serv. Indus.*, 2015 WL 3827003, at *7 (Bankr. D. Del. June 19, 2015) (*citing* 6 Del. C. § 1309).  Thus, in addition to the transfers discussed above, the April 2013 Dividend Payments to Springfield and Bradley are recoverable under the four-year period set out in the Delaware Code.

Because they sound in fraud, the Trustee's claims for actual fraudulent transfer are generally subject to Federal Rule of Civil Procedure 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009, which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).  However, because the parties to an actual fraudulent transfer rarely acknowledge their fraudulent intent, circumstantial evidence suffices for pleading and proving actual fraud.  *In re*

---

[4] Section 544 of the Bankruptcy Code authorizes the avoidance of transfers of the debtor's property that are avoidable by unsecured creditors under applicable state law (here, the Delaware Uniform Fraudulent Transfer Act).  *See* 11 U.S.C. § 544.  The requirements to state claims for avoidance of actual and constructive fraudulent transfers under the Delaware UFTA are substantially the same as those under Section 548 of the Bankruptcy Code.  *See In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160-61 (3d Cir. Aug. 11, 2014); *In re Charys Holding Co.*, 443 B.R. 628, 635-36 (Bankr. D. Del. 2010).

[5] To the extent there is confusion as to whether the Trustee alleges that the Bradley Dividend is avoidable under the Bankruptcy Code, as opposed to only under the DUFTA, Defendant Bradley is correct that it is avoidable only under Delaware law because the Transfer took place more than two years (but less than four years) prior to the Petition Date.  Any suggestion otherwise in the Complaint was inadvertent. The same substantive arguments as to the elements of the claims still apply.

28

*Polichuk*, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014).  Thus, in the context of an actual fraudulent

transfer claim, the "trustee can sufficiently plead fraudulent intent by alleging certain 'badges of

fraud.'"  *Liquid Holdings*, 2018 WL 2759301, at *17 n.32 (*quoting In re DBSI, Inc.*, 2011 WL

1810632, at *3 (Bankr. D. Del. May 5, 2011)).  These "badges of fraud," include, *inter alia*: the

lack of or inadequacy of consideration for the transfer; whether the transfer was to an insider; the

debtor's insolvency at the time of the transfer; and the general chronology of events and

transactions under inquiry.  *Id.* at *17; *see also In re Spitko*, 2007 WL 1720242, at *13 (Bankr.

E.D. Pa. June 11, 2007) (citations omitted).  Moreover, it is well-settled that "[a] bankruptcy

trustee, as a third-party outsider to the debtor's transactions, is generally afforded greater

liberality in pleading fraud."  *In re Am. Bus. Fin. Servs., Inc.*, 384 B.R. 80, 85 (Bankr. D. Del.

2008); *see also In re Fedders N. Am., Inc.*, 405 B.R. 527, 544 (Bankr. D. Del. 2009).

        Here, the Trustee alleges that the consideration for the Excessive Board Fees, the Coupon

Payments and the Dividend Payments was inadequate, that each of those transfers was made to

insiders (either Cambi, Springfield or Bradley), that the Debtors were insolvent at the time of the

transfer (as discussed in more detail below), and that the general chronology of events

surrounding these payments demonstrates fraudulent intent.  *See* Compl. ¶¶ 79-84, 90-92, 99-

100.  While the presence or absence of any single badge of fraud is "not conclusive," "'[t]he

presence of a single ... badge of fraud may cast suspicion on the transferor's intent,'" and "'the

confluence of several in one transaction generally provides conclusive evidence of an actual

intent to defraud.'"  *In re AgFeed USA, LLC*, 546 B.R. 318, 335 (Bankr. D. Del. 2016) (*quoting

In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006)).  "A court may, of course, consider factors

other than the traditional badges of fraud in an analysis of fraudulent intent," such as, for

example, if the "natural consequence" of the transfer is that the debtor's creditors were hindered, delayed, or defrauded. *In re Tribune Co.*, 464 B.R. 126, 162 (Bank. D. Del. 2011). Ultimately, the fact-specific determination of whether a transfer was made with fraudulent intent is "rarely susceptible to resolution at the summary judgment stage," let alone on a motion to dismiss. *Polichuk*, 506 B.R. at 418; *In re Adelphia Commc'ns. Corp.*, 365 B.R. 24, 35 (Bankr. S.D.N.Y. 2007).

The Excessive Board Fee payments, the Coupon Payments, and the Dividend Payments were made to insiders in exchange for no value to the Debtors at the same time that the same insiders were negotiating the very transaction that led to the demise of the company. As alleged in the Complaint, these payments did not benefit Debtors; rather they only benefited the insider recipients of them. The Excessive Board Fees were paid in exchange for no additional work by Cambi, and whatever work he did do only led to the Debtors' bankruptcy. *See, e.g.*, Compl. ¶ 84. In November 2014, Cambi even wrote his good friend Bradley to make clear to him how much he needed the newly increased board fees to live the lifestyle he decided he needed to live. *Id.* ¶ 82. The equity distributions were also made in exchange for no consideration to the Debtors. As alleged in the Complaint, contemporaneous emails showed a recognition of the illegality of the transfers by WJB employees. Indeed, with regard to one of the Springfield Coupon Payments, CFO Roy Browning wrote to Bradley "I'm sorry, but this is a capital distribution to the owners of our parent company and I felt like there could be legal risk in this type of disbursement in light of our current situation." *Id.* ¶ 91.

The significant number of transfers to insiders and their affiliated companies in the period leading up to the Redemption Transaction that caused the Debtors' collapse, particularly when

30

considered in conjunction with the lack of reasonably equivalent value, and in light of the overall

scheme to remove Demoulas and reestablish Bradley and Cambi in charge of Debtors, are

sufficient to establish actual fraudulent intent.  In addition, and as discussed below,[6] the Trustee

sufficiently alleges the Debtor's insolvency – yet another badge of fraud.  Accordingly, the

Complaint adequately sets forth the circumstances of the alleged fraudulent transfers, including

sufficient indicia of actual fraudulent intent.  Moving Defendants' motions to dismiss Counts 2

and 5 should be denied.

> **2.  Counts 3 and 5 State Claims for Avoidance of the Cambi Excessive Board Fees, the Springfield Coupon Payments and the Springfield and Bradley Dividends as Constructively Fraudulent**

A plaintiff states a claim for constructive fraudulent transfer by alleging facts

demonstrating that the debtor received less than reasonably equivalent value in exchange for the

transfer, and was insolvent at the time of the transfer or rendered insolvent as a result.  *See* 11

U.S.C. § 548(a)(1)(B); 6 Del. C. §§ 1304(a)(2) & 1305(a).  As an alternative to alleging

insolvency, a Plaintiff may allege that the Debtor was engaged at the time of the transfer "in

business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capital."  11 U.S.C. §

548(a)(1)B)(ii)(II); *see also* 6 Del. C. § 1304(a)(2)(a).  Or a plaintiff may allege that the Debtor

made the transfer "to or for the benefit of an insider . . . under an employment contract and not in

the ordinary course of business."  11 U.S.C. § 548(a)(1)(B)(ii)(IV).[7]  Constructive fraud claims

---

[6] *See infra* Section V.B.2.b and V.B.2.c.

[7] This alternative to pleading insolvency is available only under the Bankruptcy Code, as Delaware's constructive fraud statute does not contain a similar provision.  *See* 6 Del. C. § 1304 (a)(2).

31

"are subject to the lower standard of Federal Rule of Civil Procedure 8." *Pitt Penn*, 484 B.R. at 36.

a.    **The Complaint Plausibly Alleges that Debtors Received Less than Reasonably Equivalent Value in Exchange for the Transfers**

To determine whether a debtor received reasonably equivalent value, courts look to the totality of the circumstances, including: "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006) (*quoting In re R.M.L., Inc.*, 92 F.3d 139, 148-49 (3d Cir. 1996)). Courts generally find that a party receives reasonably equivalent value when it "got roughly the value it gave." *Id.* at 212-13; *see also In re Plassein Int'l Corp.*, 2008 WL 1990315, at *6 (Bankr. D. Del. May 5, 2008). Whether a debtor received reasonably equivalent value for an allegedly fraudulent transfer is a factual inquiry ordinarily "not suitable for determination on a motion to dismiss." *In re Am. Bus. Fin. Servs., Inc.*, 361 B.R. 747, 760 (Bankr. D. Del. 2007); *Charys Holding*, 443 B.R. at 637-38 (value determinations are "inherently fact driven" and "typically require[] testing through the discovery process").

As discussed above, the Complaint alleges that Debtors received no value in exchange for the transfers at issue. Cambi's Excessive Board Fees were not warranted by any additional work he provided Debtors, he and Demoulas received far more than the other Board members and Cambi's work only hurt the Debtors. *See, e.g.*, Compl. ¶¶ 80, 84; *see also Charys Holding*, 443 B.R. at 636-37 (complaint adequately pled lack of reasonably equivalent value in return for compensation when it alleged financial advisor's fees were in excess of prevailing market and applicable contract rates, and that advisor's work was substandard). The Debtors received no

32

consideration for the Springfield Coupon Payments or the Springfield and Bradley Dividends.

All of these transfers were received by insiders, so there was no arm's-length relationship. They

were also done in bad faith, as the allegations in the Complaint support. Thus, the Complaint

sufficiently alleges a lack of reasonably equivalent value. *See* Compl. ¶ 127.

> b.    **The Complaint Plausibly Alleges Debtors Were Insolvent at the Time of the Transfers or Were Thereby Rendered Insolvent**

The Complaint sufficiently alleges that the transfers made in the years leading up the

Redemption Transaction were made during insolvency. The allegations are sufficient at the

Motion to Dismiss stage, as the exact point at which the Debtors became insolvent during their

financial free-fall and demise is an issue not ripe for determination at this stage.

The Trustee's burden to plead insolvency is not onerous. *See In re FAH Liquidating

Corp.*, 572 B.R. 117, 128 (Bankr. D. Del. 2017) (as long as complaint provides enough

information "to raise a reasonable expectation that discovery will reveal evidence of" insolvency,

that is sufficient at the pleading stage) (*quoting Twombly*, 550 U.S. at 556)). The Transfers

involved a significant outlay of real assets during a several year period in which the company's

financial performance was declining. The company was desperately accepting cash infusions

from Springfield and others in the months and years leading up to its demise. *See, e.g.*, Compl. ¶

¶ 93-98. These allegations show a company that was functionally incapable of meeting its

financial obligations, which is a sufficient basis upon which Debtors' insolvency can be

plausibly inferred. *See In re Green Field Energy Servs. Inc.*, 2015 WL 5146161, at *7 (Bankr.

D. Del. Aug. 31, 2015) (explaining that detailed valuation analysis as to the timing of debtors'

pre-petition insolvency is not required at the pleading stage, as long as there is a factual basis

upon which the court can infer the debtors' financial condition). Moreover, it is well-established

that the fact-intensive insolvency analysis does not lend itself to determination at the motion to dismiss stage.  *See FAH Liquidating Corp.*, 572 B.R. at 128 ("Insolvency is a factual inquiry that often evades determination at the motion to dismiss stage."); *In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011). *In re Centaur, LLC*, 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013); *In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 456, 459 (Bankr. D. Del. 2018); *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 857 (Bankr. D. Del. 2018); *In re Glencoe Acquisition, Inc.*, 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015).

Defendants cite to several Southern District of New York cases for their contention that, in order to plead insolvency, pleadings must contain "balance sheet" information demonstrating that liabilities exceeded assets.  The District of Delaware, however, has not adopted this pleading requirement and does not require that level of detail at the pleading stage.  *See, e.g.*, *In re DVI, Inc.*, 326 B.R. 301, 307 (Bankr. D. Del. 2005) ("Even allegations of insolvency in general terms comply with Rule 8 and there is no need to allege the particulars.").  This is particularly true when the plaintiff is a trustee; "because a trustee is a third-party outsider to the debtor's transaction, he "*is 'not required to include precise calculations evidencing balance sheet insolvency.'*"  *BMT-NW Acquisition*, 582 B.R. at 858-59 (*quoting Glencoe Acquisition*, 2015 WL 3777972, at *4) (emphasis added).  In *BMT-NW Acquisition*, the court denied dismissal of constructive fraudulent transfer claims, and found that the trustee adequately alleged insolvency, unreasonably small capital, and debts beyond debtor's ability to pay when he alleged those elements generally (using language of the statute), detailed parties' relationship and acquisition, and alleged that the debtor was over-leveraged, operating at a loss, and experiencing a decline in sales.  *Id.* at 858-60; *see also In re Covenant Partners, L.P.*, 531 B.R. 84, 93 (Bankr. E.D. Pa.

2015) (allegations from which Court could reasonably infer the debtor's financial health were sufficient "for alleging insolvency of the [d]ebtor for the four years prior to bankruptcy," even though "no specific financial information is alleged on this point"); *Impala Platinum Holdings Ltd. v. A-1 Specialized Servs. and Supplies, Inc.*, 2016 WL 8256412, at *18 (E.D. Pa. Sept. 16, 2016) (allegations regarding large shareholder distributions, excessive rent payments, unearned salaries, loan forgiveness, and other transfers for which debtor did not receive reasonably equivalent value, coupled with allegation that company was insolvent at the time of or as a result of the transfers, were sufficient to plead insolvency).

Accordingly, Defendants' contention that the Complaint fails to adequately plead insolvency must be rejected.

### c.    The Complaint Plausibly Alleges Debtors Were Engaged in a Transaction that Left them With Unreasonably Small Capital

The Complaint sufficiently alleges that the transfers made in the years leading up to the Redemption Transaction were made during a period that the Debtors were "engaged in business or a transaction, or [were] about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." *See* 11 U.S.C. § 548(a)(1)(B)(ii)(II).  Even if Debtors were not insolvent at the time of the transfers at issue, they still met the standard for operating with unreasonably small capital. *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992) ("[U]nreasonably small capital denotes a financial condition short of equitable insolvency," and "refer[s] to the inability to generate sufficient profits to sustain operations.").  The Complaint's detailed allegations regarding the negotiation leading up to the Redemption Transaction, and the aftermath thereof, certainly allege that the Debtors were "about to engage" in the transaction, which left it with unreasonably small

capital, during the time it was also making the other fraudulent transfers at issue.  As such, the

allegations in the Complaint state a claim under this subsection.

Courts in this district have found allegations like those here sufficient to state a claim on

the issue of unreasonably small capital at the motion to dismiss stage.  *See e.g.*, *BMT-NW*

*Acquisition*, 582 B.R. at 859 (court could reasonably infer that company has unreasonably small

capital based on allegations regarding acquisition, over-leveraged status, operations at net loss,

and sales decline, and "[a]t the very least, these allegations warrant discovery on this issue"); *In*

*re Autobacs Strauss, Inc.*, 473 B.R. 525, 552-53 (Bankr. D. Del. 2012) (allegations that company

planned a rapid expansion even though it was grossly undercapitalized were sufficient, and

further questions regarding the issue of capitalization could not be resolved on a motion to

dismiss); *In re Jevic Holding Corp.*, 2011 WL 4345204, at *9-10 (Bankr. D. Del. Sept. 15, 2011)

(allegations that LBO drastically reduced company's equity while also nearly doubling its debt

and that refinancing projections were unrealistic and unreasonable were sufficient); *see also In re*

*B. Moss Clothing Co., Ltd.*, 2011 WL 3878387, at *7 (Bankr. D.N.J. Aug. 31, 2011) (allegations

that funds were disbursed for no consideration and over CFO's objections, and that Chapter 11

petition was filed 9 months later, were sufficient at the motion to dismiss stage, because these

facts suggested the debtor had an inability to generate enough cash flow to sustain operations).

Further, "[m]uch like the insolvency inquiry, unreasonably small capital often turns on questions

of fact, thus being inappropriate to decide on a motion to dismiss."  *BMT-NW Acquisition*, 582

B.R. at 859.

### d. The Cambi Excessive Board Fees Were Transfers to an Insider Under an Employment Contract and Not in the Ordinary Course of Business

The Excessive Board Fees paid to Cambi also qualify as constructively fraudulent transfers under the Bankruptcy Code because they were transfers to Cambi, an insider, "under an employment contract and not in the ordinary course of business."  11 U.S.C. § 548(a)(1)(B)(ii)(IV); Compl. ¶ 126.  As alleged, Cambi was employed as a member of the Board pursuant to a contract.  *Id.*   These increases to his board fees had to be specially approved, were not offered to other members of the Board except for Demoulas, were excessive, and were made during a time when the company was negotiating a transaction that would spell its demise. These payments thus were not in the ordinary course of business.  *See In re TSIC, Inc.*, 428 B.R. 103, 116 (Bankr. D. Del. 2010) ("The fact that no other director or officer received severance payments proves that [the officer's] severance payment was anything but recurring or customary. Instead, [it] was a transfer made to an insider at a time when the Debtor suffered from severe financial distress, therefore making the payment extraordinary and avoidable.").  As discussed in Section V.A.3.b, *supra*, the Complaint alleges that the fees were so excessive that their acceptance by Cambi constituted a breach of fiduciary duty. Under the Bankruptcy Code, they also qualify as constructively fraudulent transfers.

### 3. Count 4 States a Claim for Avoidance of the Springfield Loan Payments as Preferential Transfers.

The Complaint states a claim that the Springfield Loan Payments are avoidable preferential transfers.  As alleged, in the year leading up to the bankruptcy filing, the Debtors made numerous transfers to Springfield as payment of principal and interest on loans that Springfield had made to the Debtors.  Compl. ¶ 93.  These were payments to the benefit of a creditor on account of an antecedent debt.  Thus, they are avoidable preferences.  *See* 11 U.S.C.

37

§ 547(b).  Since Springfield and Cambi were insiders of Debtors, such transfers made up to one

year before the filing of the Petition are avoidable.  11 U.S.C. § 547(b)(4).[8]  Cambi and

Springfield argue that these transfers do not fall under the preference statute because the Trustee

has not adequately pled insolvency.  But, as discussed in Section V.B.2.b, *supra*, this argument is

unavailing.[9]

### 4. The Complaint Sufficiently Alleges Claims Against Cambi for the Fraudulent and Preferential Transfers to Springfield

The Complaint states claims against Cambi as the beneficiary of the transfers to

Springfield.  The Complaint alleges that Cambi controlled Springfield.  *See* Compl. ¶ 18.  The

Complaint also specifically alleges that payments to Springfield were made for the benefit of

Cambi.  *Id.* ¶ 130.  Other allegations in the Complaint also make clear that Cambi was a

beneficiary of transfers to his shell entity Springfield.  For example, it is clear from the emails

contained in the Complaint that Cambi operated through Springfield in negotiating and closing

the Redemption Transaction.  He decided when and how much of Springfield's money to loan to

Debtors.  The lines between the two were so blurred that Cambi advanced $250,000 to WJB on

January 25, 2016 and WJB transferred $250,000 to Springfield in return just a few days later.  *Id.*

¶ 97.  In short, the Complaint plainly sets forth allegations stating that the transfers to Springfield

were made for the benefit of Cambi.

---

[8] Springfield is correct that the first one of these payments was made on April 8, 2015, more than a year before the Petition Date.  Thus, the inclusion of this payment of $23,835.62 in Count 4 of the Complaint was an error, and this Count is withdrawn with respect to that single payment only.

[9] Even if insolvency were not sufficiently alleged for the entire one-year period, there is a presumption of insolvency during the 90 days leading up to the bankruptcy filing.  11 U.S.C. § 547(f).  Under this presumption, it is clear that the $250,000 payment made on February 1, 2016 was done while the Debtors were insolvent.  Compl. ¶¶ 97-98.

Because Cambi is alleged to be the beneficiary of the transfers to Springfield, the
Complaint states a claim against Cambi for those transfers without any need to pierce the
corporate veil.  In *In re ContinuityX, Inc.*, 582 B.R. 124, 136-37 (Bankr. S.D.N.Y. 2018), the
court held that a claim against the transferee company's sole shareholder, as the person for
whose benefit the transfers were made, was permissible under 11 U.S.C. § 550, which permits
the recovery by the Trustee from the initial transferee of a fraudulent transfer, ***or from "the
entity for whose benefit such transfer was made***," and that additional allegations regarding alter
ego status were not required.  As here, the individual defendant in *ContinuityX* had argued that
Section 550 did not authorize the trustee to disregard corporate separateness, so if the trustee
wanted to recover from him he would have to first obtain a judgment from the company that
received the transfers, then proceed with an alter ego claim.  582 B.R. at 136-37.  The court
explicitly rejected this argument, stating "[Defendant]'s argument ignores the plain language of
Bankruptcy Code section 550."  *Id.*  The same reasoning applies here.  Thus, the Complaint
adequately alleges Cambi's transferee status  for purposes of Plaintiff's § 550 claim, and Plaintiff
is not required to have included any veil piercing allegations in his Complaint.  *See also In re
Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 301 (D. Del. 2012) (Section 550 claim
adequately pled where defendants could "easily ascertain their transferee status from the
allegations of the complaint").

### 5. Because the Complaint Adequately States Avoidance Claims, Plaintiff's Claim for Recovery of the Avoided Transfers Under § 550 Also States a Claim for Relief

Cambi, Springfield and Bradley also move to dismiss Count 6, which seeks to recover the
Transfers or their value under 11 U.S.C. § 550 once those transfers are avoided under §§ 544,
547 and/or 548.  Their arguments hinge on the contention that Counts 2 through 5 fail to state

viable claims, and therefore Count 6 also fails to do so.  As explained above, however, Counts 2 through 5 properly state claims to avoid the Transfers as actually and constructively fraudulent and/or preferential under applicable state law and § 544 of the Bankruptcy Code, as well as 11 U.S.C. §§ 547 and 548.  Accordingly, the Trustee's claim under § 550 of the Bankruptcy Code is adequately pled as well.  *See In re Ritz Camera & Image, LLC*, 2014 WL 432192, at *3 (Bankr. D. Del. Feb. 4, 2014) ("Where a party's only basis for dismissing the complaint for recovery of payments under 11 U.S.C. § 550 is the dismissal of the underlying claim, it is proper to rule on the Section 550 claim in the same manner as the underlying claim."); *In re Wash. Mut., Inc.*, 2013 WL 3757330, at *6 (Bankr. D. Del. July 16, 2013) (denying motion to dismiss count for recovery where the court declined to dismiss related avoidance count).

### C.  The Complaint States a Claim for Aiding and Abetting Breaches of Fiduciary Duty

Under Delaware law, a claim of aiding and abetting breaches of fiduciary duty requires: "(1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Fedders*, 405 B.R. at 543-44 (*citing Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1125 (Del. Ch. 2008)).  The underlying breaches of fiduciary duties by the Moving Defendants are adequately alleged, as described above.  And the Moving Defendants do not contest the underlying breach of fiduciary duty on the part of Demoulas.

The Moving Defendants' main issue with the aiding and abetting claim appears to be that the Trustee alleged that the Moving Defendants had fiduciary duties themselves.  But this does not invalidate the claims at the motion to dismiss stage.  While a fiduciary cannot aid and abet

40

his own breach of fiduciary duty, there is no reason he cannot be held liable for aiding and abetting a breach of fiduciary duty by another fiduciary.  *See DSI Renal Holdings* 574 B.R at 474 ("[T]here is no case law that prohibits such a claim against a fiduciary.") (*quoting Brown Schools*, 368 B.R. at 402-03).  The Complaint here sufficiently alleges that the Redemption Transaction and other fraudulent transfers constituted breaches of fiduciary duties, and that the Moving Defendants all assisted in causing those breaches to occur.

Moreover, Baruch, Michalski, and even Cambi argue that they did not owe fiduciary duties to the Debtors.  The Complaint states plausible aiding and abetting claims at this stage. This is particularly true where certain Defendants claim that they have no fiduciary duties, and thus whether those Defendants had such duties, the exact contours of those duties, and when each duty attached will need to be determined in future proceedings.  *See id.* ("At this stage in the proceedings, determination of the precise outer boundaries of each [Defendant's] fiduciary duties is premature.").  The aiding and abetting claim should not be dismissed.

### D.  The Complaint Adequately Pleads a Claim for Unjust Enrichment

Under Delaware law, unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."  *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).  To state a claim, the Plaintiff must allege five elements:  "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."  *FAH Liquidating Corp.*, 572 B.R. at 130 (*citing Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  Here, the entirety of the allegations state claims that the various transfers to the Moving Defendants discussed at

length herein were unjustly retained to the impoverishment of the Debtors and their creditors. For example, Cambi was unjustly personally enriched by the Excessive Board Fees that went to him so that he could live a lavish lifestyle with no consideration provided to the company. *See* Compl. ¶¶ 82-84.

The Court may ultimately determine that unjust enrichment does not apply to some or all of the transfers, either because those transfers are covered by fraudulent transfer law, because there are certain writings that govern the applicable relationship among the parties, or for some other reason. But this is no cause to dismiss the unjust enrichment claim at this stage of the proceedings. *See FAH Liquidating Corp.*, 572 B.R. at 131 ("It is clear however, that at the pleading stage it is entirely acceptable to pursue alternative theories."). As this Court has held, unjust enrichment should survive a motion to dismiss where it is plausible that the plaintiff would otherwise be left without a remedy at law. *Id.* at 131. If, for example, the Trustee does not ultimately prove the insolvency element of his fraudulent transfer claims, he may be left without a remedy at law. *See id.* (*citing Green Field Energy*, 2015 WL 5146161, at *10). The unjust enrichment claims should thus survive at this stage.

### E.  The Complaint Adequately States a Claim for Corporate Waste

A claim for corporate waste requires alleging facts showing an exchange of corporate assets "for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade" or for "no corporate purpose." *Brown Schools*, 368 B.R. at 408. "The doctrine of waste … allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in good faith pursuit of the corporation's interests

42

could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007).

Plaintiff's waste claim is based on the extensive facts alleged that show that the Debtors significantly overpaid in the Redemption Transaction, in direct contravention of what they knew the true value of the company to be.  In fact, the Complaint alleges that the true value of the transaction to the Debtors was actually $0 because the Debtors had virtually no cash flow and were in the midst of collapsing only a month after the Redemption Transaction was completed. Compl. ¶ 66.  The Excessive Board Fees were also corporate waste as they served no rational business purpose and were commercially unreasonable.  *Id.* ¶ 156.  No business person of ordinary sound judgment could believe that Debtors received adequate consideration in exchange for these transfers.  *See Direct Response Media*, 466 B.R. at 657 (trustee stated waste claim based on company's payment of $7.6 million for which it received no benefit, compensation, or reimbursement in return); *In re TEU Holdings*, 287 B.R. 26, 35 (Bankr. D. Del. 2002) (allegations that engagement of third-party outsourcing firm "was wholly lacking in value" stated corporate waste claim against directors and officers).  Like those cases, here the transfers associated with the Redemption Transaction and Excessive Board Fees were completed for no benefit to the company, and thus the corporate waste claim should not be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.[10]

Dated: September 7, 2018                     Respectfully submitted,


                                             /s/ Ronald S. Gellert
                                             _____

                                             Ronald S. Gellert, Esq. (DE No. 4259)
                                             Gellert Scali Busenkell & Brown LLC
                                             1201 N. Orange Street, 3rd Floor
                                             Wilmington, DE 19801
                                             Tel: (302) 425-5806

                                             Steven M. Coren, Esq. (admitted *pro hac vice*)
                                             Benjamin M. Mather, Esq. (admitted *pro hac vice*)
                                             Francis X. Lane, Esq. (admitted *pro hac vice*)
                                             Kaufman, Coren & Ress, P.C.
                                             Two Commerce Square, Suite 3900
                                             2001 Market Street
                                             Philadelphia, PA 19103
                                             Tel: (215) 735-8700

                                             *Counsel for George L. Miller, Plaintiff and Chapter 7 Trustee*

---

[10] In the alternative, if the Court determines that dismissal of any claims is warranted, Plaintiff respectfully requests leave to amend the Complaint.  Leave to amend should be granted freely pursuant to Federal Rule of Civil Procedure 15(a)(2), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.  *See also Total Containment*, 335 B.R. at 601 (leave to amend, rather than dismissal, is ordinarily appropriate, unless repleading could not correct the defects in the claim).

44