# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| W.J. BRADLEY MORTGAGE CAPITAL, LLC, *et al.*, | Case No. 16-11049 (KG) (Jointly Administered) |
| Debtors. | |
| GEORGE L. MILLER, Chapter 7 Trustee for the jointly administered Chapter 7 bankruptcy estates of W.J. Bradley Company Merchant Partners 2003-SEED, LLC, W.J. Bradley Mortgage Capital, LLC, W.J. Bradley Corporate Services, LLC, W.J. Bradley Financial Services, LLC, and WJB Mortgage Services, LLC, | |
| Plaintiff, | Adv. Pro. No. 18-50385 (KG) |
| v. | |
| WILLIAM J. BRADLEY, JOSEPH A. CAMBI, ARTHUR S. DEMOULAS, GERARD LEVINS, AUDREY KIRDAR, DANIEL BARUCH, HOWARD MICHALSKI, ASD MERCHANT PARTNERS LLC, SPRINGFIELD CAPITAL, LLC, ARTHUR S. DEMOULAS CONTINUATION TRUST, ARTHUR S. DEMOULAS 2012 TRUST, and PETER PICKNELLY, | |
| Defendants. | **Re: Adv. Dkt. No. 20, 22, 24, 26** |

## CORRECTED
## MEMORANDUM OPINION[1]

---

[1] The Trustee has demanded a trial by jury and does not consent to the Court's entry of a final judgment. However, in deciding a motion to dismiss, the Court is not required to state findings of fact or conclusions of law. Bankr. R. 52(a)(3). The Court has corrected the Memorandum Opinion to deny the Motions to Dismiss the Ninth Claim (page 42).

*Counsel for George L. Miller, Chapter 7 Trustee*

GELLERT SCALI BUSENKELL
& BROWN LLC
Ronald S. Gellert, Esquire
1201 N. Orange Street, 3rd Floor
Wilmington, DE  19801
(302)425-5806

KAUFMAN, COREN & RESS, P.C.
Stephen M. Coren, Esquire
Benjamin M. Mather, Esquire
Francis X. Lane, Esquire
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
(215)735-8700

*Counsel for Defendants William J. Bradley,
Daniel Baruch and Howard Michalski*

*Counsel for Defendants Gerard Levins
and Audrey Kirdar*

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
Kenneth J. Nachbar, Esquire
Curtis S. Miller, Esquire
Daniel T. Menken, Esquire
Matthew O. Talmo, Esquire
1201 N. Market St.
Wilmington, DE 19801
(302)351-7412

PEPPER HAMILTON LLP
M. Duncan Grant, Esquire
Henry Jaffe, Esquire
Christopher B. Chuff, Esquire
Ellis Herington, Esquire
1313 Market Street
PO Box 1709
Wilmington, DE 19899
(302)777-6500

*Counsel to Defendant, Springfield Capital, LLC and Joseph A. Cambi*

CROSS & SIMON, LLC
Christopher P. Simon, Esquire
Kevin S. Mann, Esquire
1105 North Market Street, Suite 901
Wilmington, DE  19801
(302)777-4200

## **INTRODUCTION**

George L. Miller, in his capacity as Chapter 7 trustee (the "Plaintiff" or "Trustee"), brought this adversary proceeding against former managers, officers and members of debtors W.J. Bradley Company Merchant Partners 2003-SEED ("WJB SEED"), W.J. Bradley Mortgage Capital, LLC ("WJB Mortgage Capital"), W.J. Bradley Corporate Services, LLC ("WJB Corporate Services"), W.J. Bradley Financial Services, LLC ("WJB Financial Services"), and WJB Mortgage Services, LLC ("WJB Mortgage Services," and collectively, the "Debtors"). The management of the Debtors included William J. Bradley ("Bradley"), Joseph A. Cambi ("Cambi"), Arthur S. Demoulas ("Demoulas"), Gerard Levins ("Levins"), Audrey Kirdar ("Kirdar"), Daniel Baruch ("Baruch"), Howard Michalski ("Michalski"), and Peter Picknelly ("Picknelly"). The Trustee additionally brought this action against several entities affiliated with certain of the former managers and officers, including ASD Merchant Partners, LLC ("ASD"), Springfield Capital, LLC ("Springfield"), Arthur S. Demoulas Continuation Trust ("ASD Continuation Trust"), and Arthur S. Demoulas 2012 Trust ("ASD 2012 Trust," and collectively with all the non-Debtor parties, the "Defendants"). The Trustee claims that through various fraudulent and preferential transfers, the Defendants exhausted the Debtors' assets and drove the company into insolvency for their own benefit and in breach of their fiduciary duties.

Defendants moved to dismiss the nine-count complaint (the "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7012 (the "Motion" or "Motions"). There are four Motions on behalf of the Defendants.

1

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The avoidance and preference claims are core proceedings under 28 U.S.C. § 157(b)(2)(F) and (H).  The claims of breaches of fiduciary duties, aiding and abetting, unjust enrichment and corporate waste are non-core claims.  They do not fall within § 157(b)(2).  *See also Official Comm. of Unsecured Creditors v. Yucaipa American Alliance Fund I, L.P.* (*In re Allied System Holdings, Inc.*).  524 B.R. 598, 605-06 (Bankr. D. Del. 2015) ("The Court concludes that the claims . . . for breach of fiduciary duty constitute non-core, related to proceedings . . . . ").

## FACTS[2]

The Debtors were founded between 1999 and 2003 and operated as residential mortgage lenders and servicing companies. Compl. ¶¶ 8, 21. In 2007 and 2008, as a result of the housing crisis, the Debtors entered a restructuring process, during which ASD, which Defendant Demoulas owned, acquired a 65% controlling interest in the Debtors. Compl. ¶ 21. After ASD's acquisition, Bradley, the President and Chief Executive Officer of the Debtors and a member of the Debtors' Board of Managers (the "Board"), and Cambi, the Chairman of the Board, shared control of the Debtors with Demoulas, a member of the Board and the Manager of ASD. Compl. ¶¶ 9-11, 21. Bradley and Cambi

---

[2] For purposes of ruling on the Motions, the Court "must accept all of the [C]omplaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

2

regretted losing control of the Debtors and entering into a partnership with Demoulas. Compl. ¶¶ 23-25.

### A.      The Redemption Transaction

In 2014, Demoulas decided to sell his interest in the Debtors. Compl. ¶ 26. The Board proposed a transaction in which Demoulas would sell his interest to the Blackstone Group ("Blackstone"). Compl. ¶ 27. Blackstone rejected the deal in January 2015, expressing concerns with the Debtors' high costs, limited growth capabilities and ownership. Compl. ¶ 28. The collapse of the Blackstone deal was of great concern to Bradley and Cambi. Compl. ¶ 29.

Around February 2015, Bradley and Cambi discussed the possibility of Bradley, Cambi or the Debtors buying Demoulas's interest. Compl. ¶¶ 31-32. Demoulas agreed to sell his interest to Cambi for $25 million. Compl. ¶ 32.  Bradley, Cambi, and Demoulas initially structured the transaction so that Springfield, a limited liability company ("LLC") controlled by Cambi, would purchase ASD's 65% interest in the Debtors for $25 million. Compl. ¶ 37. On April 2, 2015, Springfield, ASD, and the Debtors entered into the Membership Interest Purchase Agreement ("MIPA"), which detailed the transaction's terms. Compl. ¶ 37.

During the course of negotiating the MIPA, the Board received legal advice and a presentation from Houlihan Lokey regarding the value of the Debtors. Compl. ¶¶ 40-42. In March 2015, Houlihan Lokey valued the Debtors at about $26.6 million. Compl. ¶ 41. Based on this valuation, ASD's 65% interest was worth just over $17 million. Compl. ¶ 41.  Bradley wrote an email to the Debtors' attorneys on September 3, 2015, which

discussed the Debtors' ability to redeem ASD's 65% interest if Springfield failed to secure

funding for the transaction:

> I don't believe that the ASD stock is worth more than $17.55M. [Cambi]
> agreed to offer $25M because he believed [Demoulas] wouldn't take less.
> There is no way that this [B]oard, based on [Houlihan Lokey's valuation],
> should approve the [Debtors] signing up for liability on [the] transaction.

Compl. ¶ 42. Bradley shared a similarly worded email with Cambi and his attorneys on

September 6, 2015:

> In no case could the company's balance sheet support a financing for $25M.
> . . . If Springfield felt it could come over the top with it's [sic] own
> contribution . . . that is certainly it's [sic] right . . . . But for the company to
> represent it could achieve a price that far over market . . . is . . . an obnoxious
> proposition.

Compl. ¶ 46. The parties negotiated the deal between Springfield and ASD for eight

months, but the deal never closed. Compl. ¶ 44.

After the Springfield-ASD deal collapsed in September 2015, the Debtors decided

to redeem ASD's entire membership interest (the "Redemption Transaction"). Compl. ¶¶

44-46. Despite ongoing negotiations between Bradley, Cambi, and Demoulas, the price

for the Redemption Transaction remained set at the $25 million purchase price proposed

for the Springfield-ASD transaction. Compl. ¶¶ 44-45, 55. Bradley provided updates on

the negotiations to all the Board members through email. Compl. ¶ 50. Levins and Kirdar,

who ASD appointed to the Board, did not question the redemption price. Compl. ¶ 73.

Yet, Cambi remarked on November 10, 2015, that the Debtors were "putting every penny

on the line getting ASD" the $25 million. Compl. ¶ 48. Baruch and Michalski, the Chief

Operating Officer and Executive Managing Director of the Debtors, respectively, did not

intervene in the negotiations. Compl. ¶ 70. The Board approved the Redemption Transaction, which closed on December 9, 2015. Compl. ¶¶ 51, 55.

Pursuant to the Redemption Transaction, WJB SEED transferred a total of $25 million in five separate transactions to Demoulas, the ASD Continuation Trust, and the ASD 2012 Trust on December 9, 2015. Compl. ¶¶ 55-56. WJB SEED funded the Redemption Transaction by using $16 million of the Debtors' capital and a $9 million "capital contribution" from Springfield. *See* Pl.'s Opp'n to Defs.' Mots. 25; Bradley/Baruch/Michalski Br. 20-21. The Redemption Transaction also included a Waiver and Mutual Release, which released various claims in connection with the Redemption Transaction. Compl. ¶¶ 57-58.

Shortly after the Redemption Transaction closed, the Debtors' financial condition rapidly and severely deteriorated. Compl. ¶ 61. The Debtors were thinly capitalized prior to the Redemption Transaction, and the use of corporate assets to fund the redemption left the Debtors with limited cash to operate. Compl. ¶¶ 48, 61. On December 29, 2015, less than one month after the Redemption Transaction, Cambi and Bradley started discussing methods to conceal the Debtors' cash problems. Compl. ¶¶ 62-63. By January 2016, the Debtors had "virtually no cash flow" and were "in the midst of collapsing." Compl. ¶¶ 66-67. Thus, the Debtors filed for Chapter 7 bankruptcy on April 28, 2016 (the "Petition Date"). The filing was for liquidation, not restructuring.

### B.   Other Transactions

Several transfers, in addition to the transfers associated with the Redemption Transaction, occurred prior to the Petition Date.

5

### 1. Board Fees to Demoulas and Cambi

The Debtors paid board fees to Demoulas and Cambi in the two years prior to the Petition Date. Compl. Ex. B-C. On October 1, 2012, the Board raised the annual board fees of Demoulas and Cambi from $60,000 to $250,000. Compl. ¶ 80. Then in 2013, Demoulas and Cambi received an additional annual board fee increase from $250,000 to $750,000. Compl. ¶ 81. Thus, from June 2014 to October 2015, the Debtors paid Demoulas and Cambi $187,500 in quarterly fees, for a total of $1,312,500 each (the "Board Fees"). Compl. Ex. B-C. Cambi said the Board Fees were "absolutely essential" for him "to live the lifestyle he wished to live." Compl. ¶ 82.

### 2. Bonuses Provided to Levins and Kirdar

On October 1, 2015, the Debtors paid Kirdar and Levins each a bonus of $86,250 for their work on the Redemption Transaction (the "Kirdar Bonus" and the "Levins Bonus," respectively). Compl. ¶ 88. As members of the Board, Levins and Kirdar received information about the negotiations involving the Redemption Transaction. Compl. ¶¶ 50, 85. However, Levins and Kirdar never participated in the negotiations and did not question the $25 million redemption price. Compl. ¶¶ 73, 85.

### 3. Coupon Payments to Springfield and Picknelly

During the two years prior to the Petition Date, Springfield received monthly cash dividends of $71,875 from WJB Mortgage Capital and WJB SEED (the "Springfield Coupon Payments").[3] Compl. ¶ 90. The monthly dividend payments started in May 2014

---

[3] The dividend in January 2016 totaled $25,972.22. Compl. Ex. D.

and ended in February 2016.[4] Compl. §§ 90, 91, Ex. D. The Springfield Coupon Payments totaled $1,463,472.22. *Id.*

WJB Mortgage Capital and WJB SEED also paid Picknelly monthly cash dividends of $7,500 during the two-year period prior to the Petition Date (the "Picknelly Coupon Payments").[5] Compl. ¶ 92. The Debtors transferred the first monthly dividend in May 2014 and the last in March 2016.[6] Compl. Ex. E. The Picknelly Coupon Payments totaled $165,833. Compl. § 92, Ex. E.

### 4.    Loan Payments to Springfield

The Debtors made numerous transfers to Springfield as payment of principal and interest on loans Springfield made (collectively, the "Springfield Loan Payments"). Compl. ¶ 93. The transfers occurred within one year of the Petition Date and totaled $5,268,575.35. Compl. ¶ 93. The Springfield Loan Payments are listed below:

- Springfield advanced a $3 million loan on February 3, 2015 ($750,000) and March 2, 2015 ($2.25 million). Compl. ¶ 94. The Debtors repaid the principal of $3 million on June 16, 2015, and made monthly interest payments from April 2015 to July 2015 totaling $86,301.37. Compl. ¶ 94.

- Springfield loaned $1.9 million on April 3, 2015 ($400,000) and April 23, 2015 ($1.5 million). Compl. ¶ 95. The Debtors repaid the principal of $1.9 million on June 16, 2015, and made monthly interest payments from May 2015 to July 2015 totaling $32,273.97. Compl. ¶ 95.

- Springfield exchanged Class D Units for a $1.85 million note on December 9, 2015. Compl. ¶ 96. The Debtors never repaid the principal, but paid interest on January 15, 2016 in the amount of $11,150.68. Compl. ¶ 96.

---

[4] The Debtors did not pay a dividend in December 2015. Compl. Ex. D.

[5] The dividend in March 2016 totaled $8,333. Compl. Ex. E.

[6] The Debtors did not pay a dividend in December 2015 and February 2016, and paid two dividends in January 2016. Compl. Ex. E.

- Cambi advanced $250,000 to the Debtors on January 25, 2016, and the Debtors transferred $250,000 to Springfield on February 1, 2016. Compl. ¶ 97.

**5.     Payments of Dividends to Members**

On April 12, 2013, WJB SEED paid the following dividends: $1,114,419.70 to Demoulas; $459,056.86 to Springfield; $45,183.38 to Bradley; and $9,676.47 to Picknelly (the "April 2013 Member Distributions"). Compl. ¶ 99. The Board approved these distributions on March 21, 2013. Compl. ¶ 100.

**C.     The Operating Agreement**

The Operating Agreement of WJB SEED (the "Operating Agreement") provides that "[t]he management of the business and affairs of the Company shall generally be vested in a board . . . of . . . Managers (as such term is defined in the Act)." Fourth Amended and Restated Operating Agreement of W.J. Bradley Company Merchant Partners 2003-SEED, LLC, § 7.2(a). The Operating Agreement defines the duties of the Managers as follows:

> **Duties of Manager.** A Manager shall perform his or her duties as a Manager in good faith, in a manner he or she reasonably believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Notwithstanding any contrary provisions contained herein, if **a Manager performs his or her duties without gross negligence or willful misconduct**, then he or she shall not have any liability by reason of being or having been Manager of the Company. A Manager shall be entitled to rely in good faith upon the records of the Company and upon such information, opinions, reports or statements as such Managers deem appropriate or of those persons or groups as are specified in the Act. (Emphasis supplied.)

*Id.* § 7.2(e). Further, the Operating Agreement limits the Managers' liability:

> **Exculpation and Indemnification.** No Manager or officer of the Company shall be liable to any other Manager, officer, the Company or any other Member for any act, failure to act or error of judgement related to the Company, **unless due to such Person's willful misconduct or gross negligence**. The Company shall indemnify and hold harmless each Manager and officer of the Company from and against any personal loss, liability, damage, or expense incurred as a result of any such act, failure to act or error of judgment related to the Company, to the fullest extent permitted by applicable law, **unless such loss, liability, damage, or expense results from the Manager's or officer's willful misconduct or gross negligence**. Indemnification hereunder shall include all reasonable expenses incurred, including reasonable expenses incurred, including reasonable legal and other professional fees and expenses, which shall be solely the debts, obligations and liabilities of the Company, and no Manager or officer shall be obligated personally for any such debt, obligation or liability by reason of his or her acting as a Manager or officer of the Company. Any repeal or modification of the Section 7.2(k) shall not adversely affect any right or protection of a Manager or officer existing at the time of such repeal or modification.  (Emphasis supplied.)

*Id.* § 7.2(k). The Operating Agreement also provides for officers, but does not contain their duties. *Id.* art. VIII.  Thus, management of WJB SEED is protected from common liability but not gross negligence or willful misconduct.

## STANDARD OF REVIEW

Rule 12(b)(6) provides for dismissal for "failure to state a claim upon which relief can be granted." Rule 12(b)(6) is inextricably linked to Federal Rule of Civil Procedure 8(a)(2) ("Rule 8(a)(2)"), which provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Over a decade ago, in its seminal *Twombly* decision, the Supreme Court ushered in the modern era of notice pleading under Rule 8(a)(2). The Court observed that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

9

factual allegations, a plaintiff's obligations to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The *Twombly* standard is one of "plausibility" and not "probability" - "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Id.* at 556.

The Supreme Court again addressed the Rule 8(a)(2) notice pleading standard in its *Iqbal* decision. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). The *Iqbal* decision clarifies that the *Twombly* plausibility standard applies to all civil suits filed in federal courts and identifies two "working principles" underlying the *Twombly* decision. *Id.* at 678. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

The United States Court of Appeals for the Third Circuit synthesized the preceding authorities in its *Fowler* decision:

> [A]fter *Iqbal,* when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true but may

> disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

*Fowler v. UMPC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted). With these principles in mind, the Court will proceed with its analysis of the Defendants' motions to dismiss.

## DISCUSSION

**First Claim – Breaches of Fiduciary Duties**

### A.    Generally – Duty of Loyalty

The Trustee alleges breaches of fiduciary duties against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski, who all seek the dismissal of these claims except Defendant Demoulas. The Trustee alleges that the Defendants, as either an Officer and/or Manager of the Debtors, each owed a fiduciary duty of care, good faith and loyalty to the Debtors and they breached those duties.

The Trustee must plead sufficient facts showing both the existence of a fiduciary duty and that the fiduciary breached that duty. *Beskrone v. OpenGate Capital Grp. (In re PennySaver USA Publ'g, LLC)*, 587 B.R. 445, 463-64 (Bankr. D. Del. 2018). Delaware law is clear that officers, directors, and managers owe a company they serve the traditional triad

11

duties of care, loyalty and good faith. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)). The duty of care is the duty to act on an informed basis. *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 41 (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). A breach of the duty of care requires proving gross negligence. *In re Fedders N. Am., Inc.*, 405 B.R. at 527; *see also Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1113 (Del. Ch. 2008) ("[A] corporate director is only considered to have breached his duty of care in instances of gross negligence.") (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (1994)). Gross negligence "generally requires that officers, directors, and managers fail to inform themselves fully and in a deliberate manner." *In re Fedders N. Am., Inc.*, 405 B.R. at 527 (citing *Cede & Co.*, 634 A.2d at 368).

The duty of loyalty[7] "mandates that the best interests of the corporation and its shareholders takes precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by stockholders generally." *Id.* at 540 (quoting *Cede & Co.*, 634 A.2d at 361). A sufficiently pled claim for breach of the duty of loyalty requires plaintiff to "allege facts showing that a self-interested transaction occurred, and

---

[7] The duty of good faith is a subsidiary element incorporated into the duty of loyalty. *In re Fedders N. Am., Inc.*, 405 B.R. at 540 (citing *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)). The duty to act in good faith "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care." *Id.* (citing *Stone*, 911 A.2d at 369). The Trustee only mentions and defines the duty of good faith but does not allege specific facts distinct from the breach of the duty of care. Thus, the Court will not expound on but only cursorily acknowledge this third triad.

that the transaction was unfair to the plaintiffs." *Id.* (citing *Joyce v. Cuccia*, 1997 WL 257448, at *5 (Del. Ch. May 14, 1997)).

## B.    Business Judgment Rule

In analyzing breach of fiduciary claims, Delaware courts generally apply the business judgment rule, which is the default standard of review. *Id.* (citing *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)). The business judgment rule is a "powerful presumption in favor of actions taken by the directors in that a decision made by a loyal and informed board will not be overturned by the courts" unless there is no rational business purpose. *Id.* (quoting *Cede & Co.*, 634 A.2d at 361 (Del. 1993)).

The business judgment rule is an affirmative defense and should not be considered at the motion to dismiss juncture. *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). However, an exception exists if the issue appears on the face of the complaint. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). To survive a motion to dismiss when the issue appears within the complaint itself, the plaintiff must "plead around the business judgment rule" to show it is inapplicable. *Joseph v. Frank (In re Troll Commc'ns)*, 385 B.R. 110, 118 (Bankr. D. Del. 2008) (quoting *In re Tower Air*, 416 F.3d at 238). The plaintiff bears the burden of showing the business judgment rule is inapplicable. *In re HH Liquidation, LLC*, 590 B.R. at 272 (citing *Solomon v. Armstrong*, 747 A.2d 1098, 1111-12 (Del. Ch. 1999)). This is a "near-Herculean task," *id.* (quoting *In re Tower Air, Inc.*, 416 F.3d at 238), and thus "an uphill battle." *Id.* (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014)). A plaintiff can rebut the rule by showing that the fiduciaries "in reaching [their] challenged decision, violated any one of [the] triad

13

of fiduciary duties: due care, loyalty, or good faith." *In re Troll Commc'ns*, 385 B.R. at 118 (citing *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del. 2001)).

## C.   <u>Applying the Facts to the Law</u>

In deciding a motion to dismiss, courts generally only consider the allegations contained in the complaint, exhibits attached thereto, and matters of public record. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). An exception exists for a "'document integral to or explicitly relied upon in the complaint' . . . 'without converting the motion to dismiss into one for summary judgment.'" *Schmidt*, 770 F.3d at 249 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). "'The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here the plaintiff has actual notice . . . and has relied upon these documents in framing the complaint.'" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426). It is important to note that the critical analysis lies in "whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426).

Here, the Complaint adequately alleged that each Defendant was either an Officer or Manager of the Debtors at the time of the Redemption Transaction. The Complaint alleges that Defendants Bradley and Cambi breached their duty of loyalty because they were motivated to close the Redemption Transaction to remove Defendant Demoulas from the Board rather than to advance the Debtors' best interests; Defendant Cambi also

14

approved and accepted Board Fees. The Complaint alleges that Defendants Levins and Kirdar breached their duty of loyalty by abdicating their managerial responsibilities by rubberstamping the Redemption Transaction and accepting their bonuses. The Complaint also alleges that Defendant Baruch and Michalski breached their duty of loyalty by failing to take affirmative action ensuring that the Redemption Transaction was in the Debtors' best interests. The Complaint asserts that the Defendants breached the duty of care through their gross negligence in negotiating and approving the Redemption Transaction.  Indeed, the very facts alleged give rise to the highly plausible claim that Defendants breached their duties of care.

The Redemption Transaction closed on December 9, 2015. Within a month, the Debtors lacked sufficient cash flow and were "in the midst of collapsing." Compl. ¶¶ 66-67. Less than five months later, the Debtors filed for relief under Chapter 7. The allegations in the Complaint make it plausible for the Court to infer that all the Defendants seeking dismissal may have breached their fiduciary duties.

The Trustee alleges that Houlihan Lokey's March 2015 valuation of the Debtors was $26.6 million, and that ASD's 65% interest which the Defendants sought to buy out was worth about $17 million. Compl. ¶ 41. The Trustee further alleges that on September 6, 2015, Defendant Bradley sent an email to Defendant Cambi and their attorneys writing *inter alia* that "[i]n no case could the company's balance sheet support a financing for $25M. . . . [I]n no way should [the company] ever approve a transaction that is almost over 40% higher than market and well beyond the capability of it's [sic] own balance sheet. If Springfield felt it could come over the top with it's [sic] own contribution beyond

15

what the company could be levered [sic] for – that is certainly it's [sic] right to agree to that price . . . ." Compl. ¶ 46.

The Defendants argue that the Debtors only paid $16 million of the $25 million purchase price, while Springfield provided the $9 million balance.  If this is true, then the Debtors only paid $16 million for ASD's 65% interest worth about $17 million. Yet, the Complaint shows that the entire $25 million was transferred by WJB SEED. Compl. ¶ 56. The Trustee sufficiently pled facts showing that a Debtor entity paid $25 million for an interest worth $17 million. Further discovery is necessary to determine the source of the $25 million.

Here, the Trustee raised the business judgment rule in the Complaint (at paragraph 113) stating "Defendants are not entitled to the protection of the 'business judgment rule' because the facts, as pleaded, demonstrate that they were not disinterested, and that they breached their duties of loyalty, care and good faith, and engaged in willful misconduct." The Trustee sufficiently pled around the business judgment rule by specifically alleging facts showing how each of the Defendants may have been grossly negligent and/or acted with willful misconduct. After the Redemption Transaction, the Debtors became cashflow insolvent within a month and sought liquidation within five months. Such a result reverberates in gross negligence.

## D.     Limitations – Operating Agreement

It is the case that "[c]ourts recognize contractual agreements where the fiduciary duties have been limited." *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC et al. (In re HH Liquidation, LLC)*, 590 B.R. 211, 272 (Bankr. D.

Del. 2018) (citing *Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014)). When such an agreement exists, the traditional triad of fiduciary duties are typically relegated to an operating agreement where the Debtors are organized as LLCs. Under Delaware law, members of a LLC may adopt an exculpatory provision in their operating agreement limiting "'any and all liabilities for breach . . . of duties (including fiduciary duties)' with the exception of 'any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.'" *In re HH Liquidation, LLC*, 590 B.R. at 272 (citing 6 Del. C. § 18-1101(e)). While exculpatory provisions may immunize directors, officers and managers from liability on duty of care claims, they do not for the breach of the duty of loyalty or good faith claims. *Id.* (citing *Stone*, 911 A.2d at 369-70).

The Debtors' LLC Operating Agreement was not attached to the Complaint as an exhibit nor is it a public record. However, the Operating Agreement was cited in the Complaint (at paragraph 72). At first glance is the *Schmidt* problem because the Trustee's claims are not based on an extrinsic document—the Operating Agreement. Instead, the Operating Agreement was merely cited once in reference to facts not relevant here. In *Schmidt*, the Third Circuit explained that "the justification for the integral documents exception is that it is not unfair to hold a plaintiff accountable for the contents of documents it **must have used in framing its complaint**, nor should a plaintiff be able to evade accountability for such documents simply by not attaching them to his complaint." *Schmidt*, 770 F.3d at 250 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426)) (emphasis added). The Third Circuit dealt with defendants who attached different kinds

of documents to their motion to dismiss and argued that they contained information necessary to ascertain plaintiff's injury. *Id.* at 249-50. The Third Circuit acknowledged that while that may be true, the documents could not be considered at the motion to dismiss stage because they were not integral to the complaint. *Id.* That is, the complaint was not based on the documents. *Id.*

In *Stanziale Jr. v. CopperCom (In re Conex Holdings, LLC)*, 518 B.R. 792 (Bank. D. Del. 2014), the court held that it could consider the "Operating Agreements of Conex and Holdings annexed to the Motion to Dismiss and still treat the matter under the Fed. R. Civ. P. 12(b)(6) standard because [they] fall within the Third Circuit's 'integral exception' doctrine." *Id.* at 804. The court found that the operating agreements were integral to the complaint because the trustee explicitly relied on them to allege "that Conex and Holdings are single member LLCs and were disregarded entities for federal income tax purposes." *Id.* This information was contained in the operating agreements. *Id.* On the integral documents exception issue, this Court found that in accepting the Complaint's allegations as true, "the Trustee has failed to allege sufficient facts to support a claim for breach of the implied covenant of good faith and fair dealing because the Operating Agreements and federal income tax law permit the exact conduct of which the Trustee complains." *Id.* at 805. Moreover, the "trustee is presumably on notice of the Operating Agreements by virtue of being the trustee of the Debtors' estates." *Id.* at 804 n.66.

Here, the Operating Agreement is a document integral to the Complaint. The Complaint alleges breaches of fiduciary duties. As an officer or manager of a LLC, the Defendants' fiduciary duties are governed by the Operating Agreement. Thus, a

director's, officer's or manager's fiduciary duties may be contained in the Operating Agreement and so the Operating Agreement should be the point of departure for a Trustee claiming breaches of fiduciary duties. If no exculpatory clauses exist, the Trustee should then look to the traditional triad duties. In drafting the Complaint, the Trustee knew the Debtors were LLCs. *See* Compl. ¶ 8 ("Each of the [five] WJB entities [were] a Delaware Limited Liability Company."). It would be judicially uneconomic for the Court to consider the Trustee's breach of fiduciary duty claims without considering the Operating Agreement. Where the LLC Operating Agreement explicitly limits or bars the defendants' liability for certain breaches, but the document was not attached to the complaint, the Court would be required to deny the motion to dismiss. The parties then would engage in discovery and the Court would consider the same issue on a motion for summary judgment with discovery yielding no new necessary facts.  In this case the Trustee is on notice of the Operating Agreement. The Trustee not only cites to the Operating Agreement but specifically alleges that the Defendants breached their fiduciary duties by being grossly negligent and/or committing willful misconduct. Compl. ¶ 113. The Operating Agreement's exculpation provisions shield the Defendants from any liability unless their actions rose to gross negligence or willful misconduct. *See* Fourth Amended and Restated Operating Agreement of W.J. Bradly Company Merchant Partners 2003-SEED, LLC, § 7.2(e), (k). At this juncture, the Court can consider the exculpation provisions.

The Trustee has sufficiently pled around the business judgment rule. However, even if the exculpation provisions apply, this case is distinguishable from *Conex Holdings*.

Taking all of the allegations in the Complaint as true, the Trustee has alleged sufficient facts to support a claim for the breach of fiduciary duties because the Operating Agreement does not permit the exact breaches of which the Trustee complains. The Defendants are only protected from any liability other than gross negligence or willful misconduct. The Complaint sufficiently alleges that the Defendants' actions may have constituted liability outside the scope of the exculpatory provisions. Further discovery is warranted.

### E.    Statute of Limitations

The Trustee alleges a breach of fiduciary duty claim against Defendants Levins and Kirdar for their approval and acceptance of the Levins and Kirdar Bonuses of $86,250 each. *See* Compl. ¶¶ 85-89; 115. In their joint Motion to Dismiss, Defendants Levins and Kirdar state ". . . they are not seeking dismissal of those claims at this juncture." Opening Br. in Supp. of Defs.' Gerard Levins and Audrey Kirdar's Mot. to Dismiss, 2 n.2 (D.I. 23).

The Trustee alleges a breach of fiduciary duty claim against Defendant Cambi for his receipt of the Board Fees. Defendant Cambi seeks the dismissal of this claim. "[I]n the second quarter of 2013, the annual board fees again increased for Demoulas and Cambi, this time from $250,000 to an outrageous $750,000." Compl. ¶ 81. Defendant Cambi's annual Board Fees of $750,000 was, according to the Trustee, "made with little or no discussion or deliberation by the Board." Compl. ¶ 84. Based upon the Complaint, the Debtors also received nothing in exchange, and the increase was unreasonable in light of the Debtors' financial condition. Compl. ¶ 84.

In his Motion, Defendant Cambi argues that the approval of the Board Fees occurred more than three years prepetition. Opening Br. of Joseph A. Cambi in Supp. of Mot. to Dismiss Compl., 12-13 (D.I. 23). The Trustee counters with two arguments. First, the Complaint alleges that the increase in Board Fees did not take place more than three years prepetition. Pl.'s Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss 21 (D.I. 37) (original emphasis). Second, the Complaint "alleges that the *acceptance* of each excessive fee payment constituted a breach. *Id.* ¶ 81." *Id.* The Trustee's second argument is that the breach of fiduciary duty occurred when Defendant Cambi was paid, not when his "excessive" Board Fees were approved.

Under Delaware law, a breach of fiduciary claim is subject to a three-year statute of limitations. *Eugenis VI Venture Holdings, Ltd. v. Maplewood Holdings LLC (In re AMC Investors, LLC)*, 524 B.R. 62, 80-81 (Bankr. D. Del. 2015) (citing 10 Del. C. § 8106). The limitations period begins from the date of the alleged harm. *Id.* (citing *Bren v. Capital Realty Grp. Senior Housing, Inc.*, 2004 WL 370214, at *5 (Del. Ch. Feb. 27, 2004)). Alleged harm means "the moment [] the wrongful act [accrues]—not when the harmful effects of the act are felt—even if the plaintiff is unaware of the wrong." *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *8 (Del Ch. Mar. 26, 2018) (citing *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007)). The Court finds that the statute of limitations for the Trustee's breach of fiduciary duty claim against Defendant Cambi for his Board Fees began sometime in the second quarter of 2013 (when the Board Fees were approved), not when the harmful effects were realized (when Defendant Cambi accepted each payment).

21

Delaware law also provides three bases for tolling the statute of limitations: "(1) inherently knowable injuries, (2) fraudulent concealment, and (3) equitable tolling following a breach of fiduciary duties." *Id.* (citing *Vichi v. Koninklijke Philips Electronics N.V.*, 2009 WL 4345724, at \*17 (Del Ch. Dec. 1, 2009). The Trustee does not make any specific arguments on tolling the statute of limitations and so on the Motions the Court will not (and perhaps cannot) delve further.

However, when there is a question of the timeliness of a claim involving a debtor based on applicable nonbankruptcy law, section 108 of the Bankruptcy Code comes into play. *Seitz v. Fretz (In re Covenant Partners, L.P.)*, 2017 WL 838637, at \*5 (Bankr. E.D. Pa. Mar. 2, 2017). Section 108(a) states:

> (a) **If applicable nonbankruptcy law**, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>> **(2) two years after the order for relief.**

11 U.S.C. § 108 (emphasis added).

The Trustee alleges that Defendant Cambi's Board Fees were approved sometime in the second quarter of 2013. The Petition Date was April 28, 2016. Given that the second quarter could mean April, May or June 2013, the statute of limitations for the trustee's breach of fiduciary claim may not have expired when the Debtor filed bankruptcy. Assuming that the statute of limitations did not run prepetition, section 108(a)(2) allows the Trustee to bring the breach of fiduciary claim within two years of the bankruptcy

filing. The Trustee did so as the Complaint was filed on April 16, 2018. Whether the claim was extant as of the Petition Date requires discovery and is not susceptible to the Motions.

Thus, the Court will deny Defendants Bradley, Cambi, Levins, Kirdar, Baruch, and Michalski the dismissal of the First Claim.

**Second Claim – Avoidance of Transfers Under 11 U.S.C. § 548(a)(1)(A)**

The Trustee alleges an actual fraudulent transfer claim against Defendants Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust. Defendants Cambi and Springfield seek the dismissal of this claim. The Trustee seeks to avoid: (1) Cambi's receipt of the Board Fees totaling $1,207,500; (2) the Springfield Coupon Payments totaling $1,463,472.22; and (3) the Springfield Loan Payments totaling $5,268,575.35. The Trustee argues that these transfers were made with the actual intent to hinder, delay and/or defraud the Debtors' creditors.

To avoid a transfer under section 548(a)(1)(A) of the Bankruptcy Code, the plaintiff must show that the transfer was made within two years of the petition date and the transaction was made with the intent to hinder, delay, or defraud. 11 U.S.C. § 548(a)(1)(A); *In re Fedders N. Am., Inc.*, 405 B.R. at 545. Courts often rely on circumstantial evidence to infer fraudulent intent because direct evidence is typically unavailable. *In re Fedders N. Am., Inc.*, 405 B.R. at 545. To do so, courts refer to the "badges of fraud," which include the: (i) relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency of the debtors; (iv) amount of the estate transferred; (v) reservation of control of the assets transferred; and (vi) concealment of the transfer. *Id.*

One badge is not conclusive of either liability or exculpation. *Id.* The Supreme Court is clear that "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678.

The Trustee failed sufficiently to plead actual fraud because he merely parrots the language of section 548(a)(1)(A) without providing any specific factual allegations. At most, the Trustee claims that Cambi's receipt of the Board Fees is excessive. *See* Compl. ¶¶ 79-84. Accepting the conclusion as true, it is insufficient for the Court to reasonably infer actual fraud. The same insufficient pleading applies to the Springfield Coupon and Loan Payments. The Trustee provides no facts that these transfers were made with the requisite actual fraudulent intent.

The Court will grant Defendants Cambi and Springfield the dismissal of the Second Claim.

## Third Claim – Avoidance of Transfers Under 11 U.S.C. § 548(a)(1)(B)

The Trustee alleges a constructive fraudulent transfer claim against Defendants Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust. Defendants Cambi and Springfield seek the dismissal of this claim. The Trustee seeks to avoid: (1) Cambi's receipt of the Board Fees totaling $1,207,500; (2) the Springfield Coupon Payments totaling $1,463,472.22; and (3) the Springfield Loan Payments totaling $5,268,575.35. The Trustee alleges these transfers were made while the Debtors were insolvent, or they caused the Debtors to become insolvent and the Debtors received less than reasonably equivalent value.

To avoid a transfer under section 548(a)(1)(B) of the Bankruptcy Code, the plaintiff must show that the transfer was made within two years prepetition; the debtor "received less than a reasonably equivalent value in exchange for such transfer;" and the debtor:

(I)     was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . .;

(II)    was engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital; [or]

(III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debt matured.

11 U.S.C. § 548(a)(1)(B). With respect to Cambi's Board Fees, the Trustee alleges that "Cambi was paid $187,500 quarterly fees in June 2014, August 2014, October 2014, January 2015, April 2015 and October 2015, for a total of $1,312,500."[8] Compl. ¶ 81. The Redemption Transaction did not close until December 9, 2015 and the Complaint does not make any allegations of insolvency until late December 2015 or early January 2016. The Court finds that the Trustee failed to show how any payment of Cambi's Board Fees were made while the Debtors were insolvent or that the Board Fees caused the Debtors to become insolvent. The Court need not examine the other elements because insolvency is a conjunctive, not disjunctive element.

The Court will grant Defendant Cambi the dismissal of the Third Claim against him. The Court will address Cambi's Board Fees again, *infra*.

---

[8] While the Trustee does allege that Defendant Cambi was paid a total amount of $1,312,500 in Board Fees, the Trustee is seeking to avoid $1,207,500 as excessive. The Trustee acknowledges that had the Board Fees not been exorbitantly augmented, Defendant Cambi's Board Fees would have totaled $105,000 in the two years preceding the Petition Date. *See* Compl. ¶¶ 81, 84.

With respect to the Springfield Coupon Payments, the Trustee alleges that during the two years preceding the Petition Date, Springfield "received monthly cash dividends from WJB of $71,875[, which] . . . totaled $1,463,472.22." Compl. ¶ 90. As stated above, the Trustee provides insufficient facts showing insolvency prior to late December 2015 or early January 2016. Exhibit D of the Complaint details these transfers. However, the Court finds that two of the Springfield Coupon Payments were disbursed after the Redemption Transaction's closing. First, on January 15, 2016, the Debtors paid Springfield $25,972.22. Second, on February 18, 2016, the Debtors paid Springfield $71,875.00. Given that the Trustee alleges that the Redemption Transaction resulted in cashflow insolvency in early January 2016, the Complaint's allegations that these two Springfield Coupon Payments totaling $97,847.22 were made when the Debtors were insolvent is adequate. The dates alleged allow the Court reasonably to infer that the Debtors made these payments within two years of the Petition Date. The Debtors may not have received reasonably equivalent value because the Trustee alleges that nothing was received in return.

The Court will grant in part Defendant Springfield the dismissal of the Third Claim for the Springfield Coupon Payments leading up to and including the November 13, 2015 transfer, but, will deny in part the dismissal of the Springfield Coupon Payments transferred on January 15, 2016 ($25,972.22) and February 18, 2016 ($71,875.00).  The Court will again discuss the Springfield Coupon Payments, *infra*.

With respect to the Springfield Loan Payments, the Trustee alleges that during the year preceding the Petition Date, Springfield received principal and interest payments totaling $5,268,575.35. The Court adopts the same insolvency analysis as above. The Court

finds that two Springfield Loan Payments survive dismissal. On January 15, 2016, the Debtors made one interest payment of $11,150.68. On February 1, 2016, the Debtors transferred $250,000 to Springfield.

The Court will grant in part Defendant Springfield the dismissal of the Third Claim for the Springfield Loan Payments leading up to and including the November 13, 2015 transfer, but will deny in part dismissal of the Springfield Loan Payments transferred on January 15, 2016 ($11,150.68) and February 1, 2016 ($250,000).

**Fourth Claim – Avoidance of Transfers Under 11 U.S.C. § 547(b)**

The Trustee alleges a preferential transfer claim against Defendants Cambi and Springfield, who seek its dismissal. The Trustee seeks to avoid the Springfield Loan Payments because they were made to and/or for the benefit of insiders, Defendants Cambi and Springfield, within one year of the petition date on account of an antecedent debt, while the Debtors were insolvent and the payment amounted to a sum more than either defendant would realize if the Debtors filed for relief under Chapter 7 of the Bankruptcy Code.

To avoid a transfer under section 547(b) of the Bankruptcy Code, the plaintiff must show that the transfer: (1) was made to or for the benefit of a creditor; (2) for or on account of an antecedent debt; (3) made while the debtor was insolvent; (4) made on or within 90 days of the petition date or one year if the creditor was an insider; and (5) enables such creditor to receive more than he would have if the case was a Chapter 7 liquidation. 11 U.S.C. § 547(b).

Section 547(f) states that a debtor is "presumed to have been insolvent on and during the 90 days" prior to the petition date, which is January 29, 2016. As noted above, the Court finds that the facts allow a reasonable inference of insolvency beginning January 2016. The Trustee failed to plead insolvency prior to that period. For the Springfield Loan Payments, only two payments occurred after January 2016 and only one fell within the 90-day presumption period. First, on January 15, 2016, the Debtors made one interest payment of $11,150.68 to Springfield. Second, on February 1, 2016, the Debtors transferred $250,000 to Springfield.

Alleged preferential transfers must be identified with particularity to ensure that the defendant receives sufficient notice of what transfer is sought to be avoided. *Gellert v. The Lenick Co. (In re Crucible Materials Corp.)*, 2011 WL 2669113, at *3 (Bankr. D. Del. Jul. 6, 2011). In *Crucible*, the court found that the complaint was deficient because the "trustee has not sufficiently identified the transferor of the alleged preferential payments [as] . . . there is more than one debtor . . . ." and the complaint failed to provide details of an antecedent debt. *Id.* at *4. Here, the Trustee merely alleges that "[t]he Springfield Loan Payments were transfers of property, or of an interest in property, of WJB to and/or for the benefit of Cambi and Springfield." Compl. ¶ 130. The Trustee alleges that there are five WJB Debtor entities. Compl. ¶ 1. While the Trustee does allege that the Debtor WJB SEED executed the relevant promissory notes for the loans at issue here, the Trustee broadly asserts that "WJB" made the preferential transfers. Going back to the Complaint, the Trustee denotes that "WJB" is intended to refer to the "WJB entities" or the "Debtors" collectively. Compl. ¶ 1. The Trustee's allegations of preferential transfers lack

particularity in contrast to the Trustee's allegations regarding the Redemption Transaction which was consummated in five separate transfers. Compl. ¶ 56. In the Complaint (at paragraph 56), the Trustee provides a chart identifying the transferor with particularity. The Trustee was required to make the same particular identification of a Debtor-transferor.  Unlike in *Crucible*, the Defendants only dispute the fact that the Trustee did not identify which of the five Debtor entities paid the Springfield Loan Payments. However, the Court finds that the Complaint is deficient.

The Court will grant Defendants Cambi and Springfield the dismissal of the Fourth Claim.

**Fifth Claim – Avoidance of Transfers Under 6 Del. C. §§ 1304 & 1305, 11 U.S.C. § 544**

The Trustee alleges a claim for fraudulent transfers under state law against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust. Defendants Bradley, Cambi and Springfield seek the dismissal of this claim. The Trustee seeks to avoid: (1) Bradley's April 2013 Member Distributions totaling $45,183.38; (2) Cambi's receipt of the Board Fees totaling $1,207,500; (3) the Springfield Coupon Payments totaling $1,463,472.22; (4) the Springfield Loan Payments totaling $5,268,575.35; and (5) Springfield's April 2013 Member Distributions totaling $459,056.86.

Claims under sections 1304 and 1305 of the Delaware Code are applicable to this adversary proceeding pursuant to Section 544(b)(1) of the Bankruptcy Code. Section 544(b)(1) allows the Trustee to "avoid any transfer of interest of the debtor in property or

any obligation incurred by the debtor that is voidable under applicable law." Section 1304

of the Delaware Code provides in relevant part that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>> b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. § C. 1304; Section 1305 of the Delaware Code provides in relevant part that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

6 Del. C. § 1305. Most importantly, the claw-back period for sections 1304(a)(1), (a)(2) and

1305(a) is "within 4 years after the transfer was made or the obligation was incurred . . . ." 6

Del. C. §§ 1309(1), (2). "It is undisputed that the Delaware . . . Fraudulent Transfer Acts

track section 548 of the Bankruptcy Code (or vice versa)." *Autobacs Strauss, Inc. v. Autobacs*

*Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 567 (Bankr. D. Del. 2012).

With respect to Cambi's Board Fees, the Springfield Coupon Payments, and the

Springfield Loan Payments, the Court adopts its analysis and conclusion from the Second

and Third Claims. Thus, the Court will grant Defendants Cambi and Springfield the dismissal of the Fifth Claim as to these transfers.

With respect to Bradley's and Springfield's April 2013 Member Distributions, the Complaint indicated it was paid three years prepetition. The Trustee does not have a viable claim under Delaware Code section 1304. The Trustee does not allege any facts showing: (i) actual fraud; (ii) the Debtors did not receive reasonably equivalent value; (iii) that the distributions were made when the Debtors were engaged or were about to engage in a business or transaction with unreasonably small assets; or (iv) the Debtors intended to incur or believed or reasonably should have believed that they would incur debts beyond their ability to pay as they became due. In the Complaint the Trustee alleges that "[g]iven the financial condition of WJB at that time, these dividends were unreasonable and inappropriate." Compl. ¶ 100. Without more, this one sentence allegation is insufficient.

The Court also finds that the Trustee does not have a viable claim under Delaware Code section 1305 because the Trustee failed sufficiently to plead that the distributions were made when the Debtors were insolvent or caused Debtors to become insolvent. In the Complaint (at paragraph 143), Trustee merely refers to "the financial condition of WJB at the time of the [t]ransfers" without expounding; there are no factual allegations of insolvency beyond a mere recitation of the elements.

The Court will grant Defendants Bradley and Springfield the dismissal of the Fifth Claim as to the April 2013 Member Distributions.

**Sixth Claim – Recovery of Transfers Under 11 U.S.C. § 550**

The Trustee alleges a claim for the recovery of avoided transfers against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Picknelly, Springfield, ASD, the ASD Continuation Trust and the ASD 2012 Trust. Defendants Bradley, Cambi and Springfield seek the dismissal of this claim. The Trustee seeks to recover the transfers he is attempting to avoid under the Second, Third, Fourth, and Fifth Claims. The Court can only grant the Trustee relief under section 550 to the extent the transfers are avoidable under sections 544, 547, or 548 of the Bankruptcy Code. Moreover, to the extent that the Court will deny the Defendants the dismissal of any of the claims in whole or in part, the Trustee is only entitled to "recover, for the benefit of the estate, the property transferred . . . from— (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).

The Court is granting Defendants Cambi and Springfield the dismissal of the Second Claim. The Court therefore will grant Defendants Cambi and Springfield the dismissal of the Sixth Claim as it relates to the Second Claim.

The Court is granting Defendant Cambi the dismissal of the Third Claim. The Court therefore will grant Defendant Cambi the dismissal of the Sixth Claim as it relates to the Third Claim.

The Court is granting in part and denying in part the dismissal of the Springfield Coupon and Loan Payments. The Court therefore will grant in part and deny in part for Defendant Springfield the dismissal of the Sixth Claim as it relates to the Third Claim.

Pursuant to the plain statutory language of section 550(a) above, the Court finds that Defendant Springfield was an "initial transferee" of the Springfield Coupon and Loan Payments. The Trustee may recover the avoided amounts from Defendant Springfield.

The Court is granting Defendants Cambi and Springfield the dismissal of the Fourth Claim. The Court therefore will grant Defendants Cambi and Springfield the dismissal of the Sixth Claim as it relates to the Fourth Claim.

The Court is granting Defendants Bradley, Cambi, and Springfield the dismissal of the Fifth Claim. The Court therefore will grant Defendants Bradley, Cambi and Springfield the dismissal of the Sixth Claim as it relates to the Fifth Claim.

**Seventh Claim – Aiding and Abetting Breach of Fiduciary Duty**

The Trustee alleges an aiding and abetting breaches of fiduciary duties claim against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski. They all seek the dismissal of this claim except Defendant Demoulas. The Trustee alleges that "[t]o the extent that any Defendant might be found not to have a fiduciary duty to the Debtors at the time of the transactions complained of herein, each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Defendants possessing such duties at the relevant times." Compl. ¶ 151.

To prevail on a claim for aiding and abetting breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary relationship; (2) proof that the fiduciary breached its duty; (3) proof that a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) a showing that damages to the plaintiff resulted from the

concerted action of the fiduciary and nonfiduciary." *In re Fedders N. Am., Inc.*, 405 B.R. at 544 (citing *Cargill, Inc.*, 959 A.2d at 1125). "'Knowing participation' requires a showing that the defendant both (1) participated in the breach and (2) knew at the time that the conduct assisted constituted a breach of fiduciary duty." *Miller v. Am. Capital, Ltd. (In re NewStarcom Holdings, Inc.)*, 547 B.R. 106, 119 (Bankr. D. Del. 2016) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

The Complaint alleges that each of the Defendants is a fiduciary to the Debtors. This is problematic in light of the third element above. The Trustee alternatively argues that if any of the Defendants are non-fiduciaries, the Defendants knew about the Redemption Transaction negotiations and approved its closing. Specifically, the Trustee alleges that during the negotiations of the Redemption Transaction, the Defendants "were aware that the $25 million sale price would leave WJB with very little, if any, cash to operate." Compl. ¶ 48. Moreover, the Trustee alleges that the Defendants received "the Board presentation by HL valuing ASD's shares at approximately $17 million . . ." for which they paid $25 million. Compl. ¶50. It is important to note that in the same paragraph, the Trustee refers to the "Manager Defendants" as "Board members." Compl. ¶ 50. This would clearly be fatal to the Trustee's claim here.

Nevertheless, at the motion to dismiss stage, "determination of the precise boundaries of each D & O Defendant's . . . fiduciary duties is premature. . . [as] the directors may prove to be shielded by their exculpatory clauses, but . . . could be held liable for aiding and abetting a fiduciary duty by any D & O Defendant." *Giuliano v.*

34

*Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 474-75 (Bankr. D. Del. 2017).

Moreover:

> Although the elements of a claim for aiding and abetting a breach of fiduciary duty count are couched in terms of the primary violator being a fiduciary and the aider and abettor a non-fiduciary, there is no case law that precludes such a claim against a fiduciary. <u>While a corporate director owes the corporation fiduciary duties, in some instances those duties may be limited (by corporate charter or statute). Thus, the Court may find that a director had no fiduciary duty but aided and abetted a party that did.</u> (Emphasis added.)

*Id.* at 474 n.87 (citing *Miller v. McCown De Leeuw & Co., Inc. (In re The Brown Schools)*, 368 B.R. 394, 402-03 (Bankr. D. Del. 2007)). In connection with the First Claim, the Court found that the Defendants may have breached their fiduciary duties to the Debtors but that further discovery is warranted. It is possible that upon further discovery, it may be proved that one or more of the Defendants did not have any fiduciary duties or may be shielded by the Operating Agreement's exculpatory provisions. In such a case, the aiding and abetting claim may be viable. The Court acknowledges that the Trustee does allege that the Defendants' actions exceeded the scope of the protected liability under the exculpation provision. However, the Trustee sufficiently pleads this claim in the alternative[9] and the Court finds that further discovery on the issue is warranted. The Trustee sufficiently alleges aiding and abetting breaches of the fiduciary duties in the alternative.

---

[9] Federal Rule of Civil Procedure 8, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015, allows for a plaintiff to plead in the alternative. *See also Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc., (In re Tousa Inc.)*, 408 B.R. 913, 920 (Bankr. E.D. Fla. 2009) ("Pleading in the alternative is a perfectly acceptable practice under the Federal Rules of Civil Procedure up to and including the motion to dismiss stage.").

The Court will deny Defendants Bradley, Cambi, Levins, Kirdar, Baruch and Michalski the dismissal of the Seventh Claim.

**Eighth Claim – Corporate Waste**

The Trustee brings a corporate waste claim against Defendants Bradley, Cambi, Demoulas, Levins, Kirdar, Baruch and Michalski.  All except Defendant Demoulas seek dismissal of this claim. The Trustee alleges that the Redemption Transaction "had no business purpose and was so commercially unreasonable that no business person of ordinary sound judgment could believe that Debtors received adequate consideration in exchange for the $25 million redemption price paid to ASD." Compl. ¶ 155. The Trustee alleges that the Board Fees and the Levin & Kirdar Bonuses are also waste because they "served no rational purpose and were clearly commercially unreasonable" as the Debtors received no benefit. Compl. ¶ 156.

A corporate waste claim is similar to a breach of fiduciary duty claim as the former "implicates a matter peculiar to corporations—activities concerning relationships *inter se* of the corporation, its directors, officers and shareholders." *In re Fedders N. Am., Inc.*, 405 B.R. at 549 (citing *In re First Interstate Bancorp Consol. S'holder Litig.*, 729 A.2d 851, 862-63 (Del. Ch. 1998)). However, a corporate waste claim embodies an "extreme test, very rarely satisfied by [a] . . . plaintiff." *In re USDigital, Inc.*, 443 B.R. at 47 (citing *Weiss v. Swanson*, 948 A.2d 433, 452 (Del. Ch. Mar. 7, 2008) (quoting *Zupnick v. Goizueta*, 698 A.2d 384, 387 (Del. Ch. Jan.21, 1997)). Corporate waste exists where the consideration received for a transfer of corporate assets is so deficient that no reasonable person could conclude the

transfer serves a corporate purpose. *Id.* (citing *Weiss*, 948 A.2d at 450 (citing *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).

To survive a motion to dismiss on a corporate waste claim, Delaware law requires "pleading of facts that show that the economics of the transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction beneficial to the corporation." *In re Fedders N. Am., Inc.*, 405 B.R. at 549 (citing *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 893 (Del. Ch. 1999)). If "'any reasonable person could conclude that the deal made sense, then the judicial inquiry ends.'" *Id.* (quoting *Steiner v. Meyerson*, 1995 WL 441999, at *1 (Del. Ch. Jul. 19, 1995)).

The Trustee alleges that Houlihan Lokey's March 2015 valuation of the Debtors was $26.6 million and so ASD's 65% interest which the Defendants sought to buy out was only worth about $17 million. Compl. ¶ 41. On September 3, 2015, Defendant Bradley emailed the Debtors' attorneys writing *inter alia* "[i]n my opinion, and it's just my opinion, I don't believe that the ASD stock is worth more than $17.55 million. . . . There is no way that **this board, based on the information they received in March [2015],** should approve the Company signing up for liability on a transaction that is probably $7.5M overpriced . . . ." Compl. ¶ 42 (emphasis added). The Court's emphasis gives color to the Trustee's allegations that the entire Board was aware of the ongoing Redemption Transaction negotiations. *See* Compl. ¶ 50. The Trustee further alleges that on September 6, 2015, Defendant Bradley sent an email to Defendant Cambi and his attorneys writing, *inter alia,* that "[i]n no case could the company's balance sheet support a financing for $25M. . . . [I]n no way should [the company] ever approve a transaction that is almost

37

over 40% higher than market and well beyond the capability of it's [sic] own balance sheet. If Springfield felt it could come over the top with it's [sic] own contribution beyond what the company could be levered [sic] for – that is certainly it's [sic] right to agree to that price . . . ." Compl. ¶ 46. Moreover, the Trustee alleges that the Defendants were aware that a $25 million sale price would leave the Debtors with "very little, if any, cash to operate." Compl. ¶ 48.

In the Motions, the Defendants argue that the Debtors only paid $16 million of the $25 million purchase price, while Springfield provided the $9 million balance. *See* Opening Br. in Supp. of Mot. to Dismiss,[10] 7-8 (D.I. No. 27); Opening Br. of Joseph A. Cambi in Supp. of Mot. to Dismiss Compl., 4 (D.I. No. 23); Opening Br. of Springfield Capital, LLC in Supp. of Mot. to Dismiss Compl., 3-4 (D.I. No. 25). If this is true, then the Defendants' authorization of the Redemption Transaction did not constitute corporate waste. They paid $16 million for ASD's 65% interest worth about $17 million. However, the Trustee makes a sound point in his opposition: "[e]ven accepting Defendants' contention that Springfield made a $9 million contribution ***in return for capital in the company***, those funds still constitute property of the Debtors. As alleged in the Complaint, the Debtors paid $25 million, transferred directly from Debtor WJB SEED to Demoulas or entities he controlled." *See* Pl.'s Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss 4 (D.I. No. 37) (original emphasis). Accepting the Complaint's well-pleaded facts as true (and Defendants saying otherwise does not make it so), the Court

---

[10] This Motion was brought by Defendants Bradley, Baruch and Michalski.

finds that it is possible that the economics of the Redemption Transaction were so flawed that no disinterested person of right mind and ordinary business judgment could think the transaction was beneficial to the Debtors.

First, the Trustee alleges that Defendant Cambi is the Chairman of the Debtors' Board and President and Manager of Defendant Springfield. Compl. ¶¶ 10, 18. This insider fact gives rise to a reasonable inference that the Redemption Transaction may have been grossly amiss when considering the totality of the allegations. Second, the Complaint adequately shows that the entire $25 million was transferred by WJB SEED for ASD's 65% interest. As it stands, the Trustee sufficiently pled facts showing corporate waste given that a Debtor entity paid $25 million for an interest worth $17 million and the Debtors became cashflow insolvent within a month of the transaction's closing. However, further discovery into the Redemption Transaction, and specifically further inquiry into the source of the $25 million that the Debtor WJB SEED paid, is warranted.

The Trustee sufficiently alleges facts showing that Defendant Cambi's Board Fees may constitute waste. In Delaware, the board has "authority and broad discretion to make executive compensation decisions." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009). However, such discretion is not unfettered. When executive compensation is disproportionately large, it can be unconscionable and constitute waste. *Id.* (citing *Brehm v. Eisner*, 746 A.2d 244, 262 n. 56 (Del. 2000) (citations omitted)). Here, the Trustee alleges that Defendant Cambi's annual board fees increased from "$250,000 to $750,000." Compl. ¶ 81. Defendant Cambi received $187,500 in quarterly fees in June 2014, August 2014, October 2014, January 2015, April 2015, July 2015 and October 2015

for a total of $1,312,500. *Id.* The Trustee's allegations chronicle the Defendants' desire for a Redemption Transaction from as early as 2014. *See* Compl. ¶¶ 21-27. Given that Defendant Cambi's Board Fees were significantly augmented and paid during a time when he began to engage in a transaction that may likewise constitute waste itself, his disproportionally large compensation may constitute waste. Further inquiry is necessary. The same analysis applies to Defendants Levins' and Kirdar's Bonuses. The Trustee alleges that Defendants Levins and Kirdar were paid a one-time bonus of $86,250 on October 1, 2015 in connection with their role (or lack thereof) in the Redemption Transaction. As the Redemption Transaction may constitute waste, further inquiry into these bonuses is merited.

The Court will deny Defendants Bradley, Cambi, Levins, Kirdar, Baruch and Michalski the dismissal of the Eighth Claim.

**Ninth Claim – Unjust Enrichment**

The Trustee alleges an unjust enrichment claim against all Defendants. Defendants Bradley, Cambi, Springfield, Levins, Kirdar, Baruch and Michalski seek the dismissal of this claim. To establish an unjust enrichment claim, the plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Emerald Capital Advisors Corp. v. Bayerische Moteren Weke Aktiengesellschaft (In re FAH Liquidating Corp.)*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (citing *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

First, the Trustee pleads sufficient facts showing an enrichment as the Defendants benefited from regaining control of the Debtors through the Redemption Transaction. Second, the Trustee alleges that the Debtors suffered an impoverishment as they became cashflow insolvent a month after the Redemption Transaction closed and sought liquidation less than five months later. Third, the Trustee alleges facts showing a relation between the enrichment and impoverishment as the Defendants' acquisition of ASD's 65% interest in the Debtors led to the Debtors' insolvency.

Fourth, the Trustee sufficiently pleads facts showing an absence of justification for the Redemption Transaction. *See* Compl. ¶¶ 21-25.  The Defendants argue that it is appropriate to repurchase shares of a shareholder who is making it impossible for the company's management to operate the company's business.  The cases Defendants point to in support of their position do generally hold that "if the actions of the board were motivated by a sincere belief that the buying out of the dissident stockholder was necessary to maintain what the board believed to be proper business practices, the board will not be held liable for such decision" even though, as here, "the decision was not the wisest course." *Cheff v. Mathes*, 199 A.2d 136 (Del. Ch. 1960).  The burden of proof is, however, on the Defendants to show that the repurchase of shares was primarily in the interest of the corporation.  *Id.*  The allegations in the Complaint do not point to Defendants acting in the interest of Debtors but, rather themselves.  The Court finds that the Complaint, on its face, does plead an absence of justification for the buyout.  If the Board has acted principally to perpetuate themselves in office, then using corporate funds

41

is improper. *Bennett v. Propp*, 187 A.2d 405 (Del. 1962). The Complaint alleges just that. As such, the Trustee has satisfied the fourth element necessary to find unjust enrichment.

Fifth, the Trustee alleges facts showing the absence of a remedy provided by law.

The Court will deny Defendants Bradley, Cambi, Springfield, Levins, Kirdar, Baruch and Michalski the dismissal of the Ninth Claim.

**Leave to Amend**

Federal Rule of Civil Procedure 15(a), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015, provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Granting such leave is within the court's discretion and courts liberally allow amendments. *See, e.g., Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 192-93; *In re Crucible Materials Corp.*, 2011 WL 2669113, at *4-5. However, "denial of leave to amend is justified if there is undue delay, bad faith, a dilatory motive, prejudice or futility." *In re Valley Media, Inc.*, 288 B.R. at 193 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434).

In a footnote in the Trustee's Opposition to the Defendants' Motions to Dismiss, he seeks leave to amend in the event the Court dismisses any of his claims. *See* Pl.'s Omnibus Mem. of Law in Opp'n to Defs.' Mots. to Dismiss, 44 n.10 (D.I. No. 37). The district court previously observed that where a plaintiff only requested leave to amend in a footnote in a response in opposing a motion to dismiss, doing so was not the proper method to seek leave to amend. *Malivuk v. Ameripark, LLC*, 694 Fed. Appx. 705, 710-11

(11th Cir. 2017) (citing *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1222 (11th Cir. 1999) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.")). Moreover, a plaintiff's request for leave to amend a complaint is improper without indicating the particular grounds on which amendment is sought. *Mackereth v. Kooma, Inc.*, 2015 WL 2337273, at *12 (E.D. Pa. May 14, 2015) (quoting *U.S. ex rel Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) (denying plaintiff's footnote request for leave to amend the response in opposition to defendants' motion to dismiss). Furthermore, had the Trustee attached a draft amended complaint to his response, the propriety of his movement to amend would have been strengthened, though not dispositive. *Id.*

Furthermore, the Trustee had the opportunity to amend his Complaint within 21 days when he received service of the Defendants' Rule 12(b) Motions. Fed. R. Civ. P. 15(a)(1)(B). The Trustee was on notice of the possibly deficient Complaint but opted to oppose the Motions instead of amend. The Court will deny the Trustee's request for leave to amend based on procedural infirmities. The Court is not making a finding of undue delay, bad faith, a dilatory motive, prejudice or futility. Rather, the Court finds that a request for leave to amend a complaint that is merely embedded in a footnote of an omnibus opposition memorandum to motions to dismiss is improper.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Defendants' Motions to Dismiss without prejudice. The Trustee is directed to prepare and circulate a form of order which reflects the Court's rulings and thereafter to submit the proposed order to the Court.

Dated:  February 1, 2019

KEVIN GROSS, U.S.B.J.